**WARSHAW LAW FIRM, LLC**
**Julie Warshaw, Esq.** (ID# 027931993)
220 Davidson Avenue, Suite 124
Somerset, New Jersey 08873
<u>MAILING ADDRESS:</u>
P.O. Box 276
Liberty Corner, New Jersey 07938
Phone (973) 433-2121
Fax (973) 439-1047
<u>jwarshaw@warshawlawfirm.com</u>
Attorney for Defendants/Counterclaimants

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## NEWARK VICINAGE

| | |
|---|---|
| **EAST BRUNSWICK TOWNSHIP BOARD OF EDUCATION**<br><br>Plaintiff,<br><br>vs.<br><br>**D.S. and M.S. o/b/o/ A.S.;**<br><br>Defendants. | **CIVIL ACTION**<br><br>**Case No.: 2:21-cv-08279 (BRM-TJB)**<br><br>**BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |

## BRIEF IN SUPPORT OF DEFENDANTS/COUNTERCLAIMANTS'
## MOTION FOR SUMMARY JUDGMENT

On the Brief:
Julie Warshaw, Esq.
Dated: October 24, 2022

i

# TABLE OF CONTENTS

TABLE OF AUTHORITIES                                              iv

STATEMENT OF UNDISPUTED MATERIAL FACTS              1

LEGAL ARGUMENT                                              1

POINT I- STANDARD OF REVIEW                              1

POINT   II-JUDGE   CROWLEY'S   CREDIBILTY   AND   FACTUAL
DETERMINATIONS WERE CORRECT AND MUST BE UPHELD        2

POINT III- THE DISTRICT IS INCORRECT WHEN IT STATES THAT JUDGE
CROWLEY GAVE LITTLE WEIGHT TO THE DISTRICT'S INDEPENDENT
PROFESSIONALS AND OVERLOOKED MUCH OF THE RELEVANT
TESTIMONY                                              13

POINT IV-THE DISTRICT FAILED TO MEET ITS BURDEN OF PROOF,
THE IEPS WERE NOT APPROPIATE AND IT DENIED A.S. FAPE       17

POINT V-A.S.'S IEPS WERE NOT APPROPRIATE WHEN THEY WERE
DRAFTED EVEN UNDER THE SNAPSHOT RULE                21

POINT VI-THE DISTRICT FAILED TO EVALUATE A.S. IN ALL
AREAS OF SUSPECTED DISABILITIES AND COMMITTED PROCEDURAL
AND SUBSTANTIVE VIOLATIONS                              24

POINT VII-A.S. IS ENTITLED TO COMPENSATORY
EDUCATION                                              27

POINT VIII- THE DISTRICT IS NOT CORRECT WHEN IT ASSERTS THAT
JUDGE   CROWLEY   FAILED   TO   APPLY   THE   EQUITABLE
CONSIDERATIONS TO WARRANT DENYING OR REDUCING TUITION
REIMBURSEMENT                                              29

POINT IX-A.S.'S PARENTS GAVE PROPER 10 DAY NOTICE OF A UNILATERAL PLACEMENT AT THE LEWIS SCHOOL OF PRINCETON                                                    35

POINT X-DEFENDANTS DO NOT HAVE THE SAME BURDEN OF PROOF AS THE DISTRICT ABOUT THE APPROPRIATENESS OF THEIR UNILATERAL PLACEMENT: THEY MET THAT BURDEN        37

POINT XI-THE LEWIS SCHOOL IS AN APPROPRIATE LEARNING ENVIRONMENT FOR A.S.                                              39

POINT XII- DEFENDANTS' COUNTERCLAIMS MUST BE GRANTED 40

CONCLUSION                                                          40

## TABLE OF AUTHORITIES

Baer v. Klagholz, 339 N.J. Super. 168 (App. Div. 2001)                18

Batchelor v. Rose Tree Media School District, 759 F. 3d 266 (2014)        28

Bd. of Educ. of Hendrick Hudson Central School Dist. v. Rowley, 458 U.S. 176, 102 S. Ct. 3034, 73 L. Ed. 2d 690 (1982)                39

Bernardsville Bd. of Educ. v. J.H., 42 F.3d 149 (3d Cir. 1994)        34

Blunt v. Lower Merion School Dist., 767 F. 3d 247 (3d Cir. 2014)        25

Carter v. Florence County Sch. Dist., 950 F2d 15 (4th Cir.1991), aff'd 510 U.S. 7 (1993)                38

C.G. v. Five Town Cmty. Sch. Dist., 513 F.3d 279 (1st Cir. 2008)        34

C.H. v. Cape Henlopen Sch. Dist., 606 F.3d 59 (3d Cir. 2010)        19, 32

D.C. v. Mount Olive Twp. Bd. of Educ., 2014 U.S. Dist. LEXIS 45788, 2014 WL 1293534 (D.N.J. Mar. 31, 2014)                19

Endrew F. v Douglas County School District, 137 S. Ct. 988 (2017)   19, 20, 21, 22

F.D. v. Holland Twp. Bd. of Educ., 2007 U.S. Dist. LEXIS 49293, 2007 WL 2021782 (D.N.J. July 9, 2007)                37

F.H. et al., v. West Morris Regional High School Board of Education, 2020 U.S. Dist. LEXIS 230053 (NJ Dist. Ct 12/8/20)                33

Florence County School District Four v. Carter, 510 U.S. 7 (1993)        32, 38, 39

Forest Grove Sch. Dist. v. T.A., 129 S. Ct. 2484, 2496, 174 L. Ed. 2d 168 (2009)                34

Fuhrmann v. East Hanover Bd. of Educ., 993 F. 2d 1031 (3d Cir. 1993)        17, 22

K. E. & B. E., o/b/o T.E., v. Northern Highlands Regional Board of Education, 2020 U.S. App. LEXIS 39524 (3rd Cir. 2020)                33

K.E. and B.E. v. N. Highlands Reg'l Bd. of Educ., 2019 U.S. Dist. LEXIS 189179, vacated and remanded 840 Fed. Appx 705 (3rd Cir. 2020)                36

Knable ex rel. Knable v. Bexley City Sch. Dist., 238 F.3d 755 (6th Cir. 2001) 19

Lascari v. Board of Education of the Ramapo Indian Hills Regional High School District, 116 N.J. 30, 560 A.2d 1180 (1989)                16, 17, 18

Lauren W. ex rel. Jean W. v. DeFlaminis, 480 F.3d 259 (3d Cir. 2007)         27

Mary Courtney T. v. Sch. Dist., 575 F.3d 235, 2009 U.S. App. LEXIS 17001, *32 (3d Cir. Pa. 2009)                19

M.C. on behalf of J.C.v. Central Regional School District, 81 F.3d 389 (3d. Cir. 1996), cert. den, 519 U.S. 866 (1996)                27, 28

Mittman v. Livingston Twp. Bd. of Educ., No. 09-4754 (DRD), 2010 U.S. Dist. LEXIS 107419 (D.N.J. Oct. 7, 2010)                34

Oberti v. Board of Educ. Of Borough of Clementon Sch. Dist., 995 F. 2d 1204 (3d Cir. 1993)                26

P.P. v. W. Chester Area Sch. Dist., 585 F. 3d 727 (3d Cir. 1995)         1, 24, 27

Roland M. v. Concord Sch. Comm., 910 F.2d 983 (1st Cir. 1990)         22, 34

Sarah M. v. Weast, 111 F. Supp. 2d 695 (D. Md. 2000)                36

School Committee of Town of Burlington v. Department of Educ. of Mass., 471 U.S. 359, 105 S. Ct. 1996, 85 L.Ed.2d 385 (1985)                35

Shore Reg'l High Sch. Bd. of Educ. v. P.S., 381 F.3d 194 (3d Cir. 2004)     1, 25

T.H. ex rel. A.H. v. Clinton Twp. Bd. of Educ., 2006 U.S. Dist. LEXIS 27432, 2006 WL 1128713 (D.N.J. Apr. 25, 2006)                36

T.R. Ex rel. N.R. v. Kingwood Township Board of Education, 205 F.3d 572 (2000)                26

<u>Upper Freehold Reg'l, Bd. of Educ. v. T.W. & M.</u>, Civil Action No. 09-1847
(JAP), 2011 U.S. Dist. LEXIS 35660 (D.N.J. Mar. 31, 2011) 34

<u>V.M. ex rel B.M. v. Sparta Twp. Bd. of Educ.</u>, 2014 U.S. Dist.
LEXIS 91254 24, 25

<u>W.M. v. Lakeland Cent. Sch. Dist.</u>, 783 F. Supp. 2d 497 (S.D.N.Y. 2011) 37

20 <u>U.S.C.</u> § 1415(i)(2)(C)(i)-(iii) 1

20 U.S.C. § 1412(a)(10)(C)(iii) 33

20 U.S.C.  § 1415(f)(3)(E)(ii) 19

20 U.S.C. Section 1414(d)(1)(A)(i)(I)-(III) 22

20 U.S.C. § 1414(d)(1)(A)(i)(IV) 22

20 U.S.C. § 1414(b) 24

20 U.S.C. § 1415(b)(6)(A) 24

20 U.S.C. 1412 (a)(5) 25

20 U.S.C. § 1412 (a)(10)(C) 35

20 U.S.C. § 1412 35

20 U.S.C. §1400(d)(2) 35

<u>N.J.A.C.</u> 6A:14-2.10 (c)(1)-(c)(4) 29

N.J.A.C. 6A:14-2.3(g) and (h) 29

N.J.A.C. 6A:14-2.10 31, 32

N.J.A.C. 6A:14-2.10(c) 35, 36

<u>N.J.A.C</u>. Section 1:6A-14.1 (d) 18

N.J.A.C. §6A:14-2.7(k)                                              19

N.J.A.C. 6A:14-2.5(a)(1), 2.5(c)(5) 210 and 3.4(i)                 24

N.J.A.C. § 6A:143.5(c)                                             25

N.J.A.C. § 6A:14-2.10 (c)                                          35

N.J.S.A. Section 18A: 46-1.1                                       17

34 C.F.R. § 300.12(d)(3)(i)                                        18

34 C.F.R. § 300.513(a)(2)                                          19

34 C.F.R. § 209.300.304(b)(1)                                      24

34 C.F.R. 300.303                                                  25

34 C.F.R. 300.304-300.311                                         25

34 CFR § 300.148                                                  35

## STATEMENT OF UNDISPUTED MATERIAL FACTS

Defendants/Counterclaimants shall rely upon and incorporate by reference the Administrative Record, M.S.'s Certification, and Defendants' Statement of Undisputed Material Facts, attached hereto.

## LEGAL ARGUMENT
## POINT I- STANDARD OF REVIEW

Under the IDEA's administrative process, in reviewing disputed matters, the District Court performs a "modified *de novo* review." P.P. v. W. Chester Area Sch. Dist., 585 F. 3d 727, 734 (3d Cir. 1995). While factual findings are considered *prima facie* correct, the District Court may deviate from these findings, provided an explanation for the deviation is given. Id. Thus, the District Court "must make its own findings by a preponderance of evidence . . . while afford[ing] 'due weight' to the ALJ's determination." Shore Reg'l High Sch. Bd. of Educ. v. P.S., 381 F.3d 194, 199 (3d Cir. 2004). With regard to live testimony and credibility determinations, "a District Court must accept the state agency's credibility determinations unless the non-testimonial, extrinsic evidence in the record would justify a contrary conclusion." Id.; 20 U.S.C. § 1415(i)(2)(C)(i)-(iii).

In the present case, there was no extrinsic evidence presented by either party so the record from which to determine this motion is confined to the testimony and evidence presented at the Office of Administrative Law due process hearing held on August 10, 12, and 14, 2022, before the Honorable Sarah G. Crowley, A.L.J.

and as set forth in Her Honor's Final Decision dated January 5, 2021. Judge Crowley's credibility determinations are sound, supported and not contrary to any documentary evidence. Thus, Plaintiff's appeal is baseless and must be denied.

## POINT II- JUDGE CROWLEY'S CREDIBILTY AND FACTUAL DETERMINATIONS WERE CORRECT AND MUST BE UPHELD

Judge Crowley's credibility and factual determinations must be upheld because Plaintiff failed to provide any non-testimonial extrinsic evidence that would justify a reversal or a contrary conclusion from what Judge Crowley determined in Her Honor's Final Decision. Although Plaintiff attempts to argue Judge Crowley's decision was incorrect because Her Honor did not evaluate the district's witnesses fairly or take into consideration their credentials, and did not allow one witness to testify, that is not supported by the facts or testimony. Plaintiff also tries to argue that the parent of A.S. "obstructed the district's attempts to procure for A.S. an appropriate educational program and placement by rejecting the district's implementation of various proposed programs," which again is simply not true based on the evidence. Judge Crowley made credibility determinations of all of the witnesses based on the testimony and evidence presented and noted:

> Having had an opportunity to carefully observe the demeanor of the witnesses, it is my view, and I **FIND** that M.S. was sincere and credible.  I also **FIND** that the testimony from Jaime Lehrhoff was credible and was consistent with the facts and documentary evidence presented at the hearing. On the contrary, I **FIND** that the testimony of Connor Scott and Jacqueline Emert was not credible, **and their testimony was inconsistent with the**

**documentary evidence and their own testimony about the program that was provided to A.S.**  (emphasis added) (Final Decision, page 9)

Judge Crowley noted there were inconsistencies in the testimony of the district's witnesses and the documentary evidence presented. For example, Connor Scott, the Supervisor of Special Services testified that he reviewed A.S.'s IEP and noted:

> When I reviewed this IEP it seemed like -- that there were some difficulties that A.[S.] was having in class. It also seemed like -- I can't recall if this is from my conversations with Mrs. Emert or from this IEP specifically, but I do know that there were changes to the program that happened during ninth grade and I also noted that her standardized testing score didn't demonstrate proficiency and I noted that there were no recent evaluations as part of this IEP. (2T13:11-14:1).

Mr. Scott was questioned directly by Judge Crowley, and he responded:

> We had multiple conversations throughout the year. Mrs. S. acknowledged that A.[S.] was academically limited and that she needed more support, but she felt that the social benefits of the in-class resource were more important and were more beneficial to A.[S.] and said that she wasn't like the students in the resource room. So she should be placed in the in-class support setting. 2T25:1-7.

Mr. Scott also stated, "A.[S.]'s current program is not addressing her deficits…" 2T75:8-14. Mr. Scott made excuses as to why the district was not providing A.S. with related services such as speech when he stated, "So the parents were -- you know, they were having private tutors come in a couple days a week to help support her academically. It wasn't really helping us in school in terms of meeting her deficits and they did have her in therapy. So she was, you know, receiving some outside services. They were amenable to co-op. So we -- we were working

together collaboratively even though we weren't necessarily addressing the issues."

2T75:24-76:9; See also 2T83:4-14. Mr. Scott admitted that academics were not the

district's priority for A.S. and that the district was basically passing her through

without her earning her grades, when he stated,

> At that point it was discussed that the goal was really not for academics, that
> it was not an appropriate academic placement, but she would increase or
> continue her exposure to typical peers. So we added in an accommodations
> that's -- or a modification on page 13. So if you look about halfway through
> the page in capital letters it says, "all content areas -- across all content areas
> with in-class resource modify A.[S.]'s curriculum, instruction and grading
> standards to the expectations of a resource center setting. "Expose A.[S.] to
> topics in the curriculum and remove skills that are above her instructional
> level after the introduction and attempts to master skills. Facilitate positive
> peer interactions." So one area that that really applied to was math. The
> algebra two curriculum is very intensive and A.[S.] was failing that course
> during the first marking period. The teacher allowed a whole bunch of
> retakes for assessments or resubmission for work and also modified the
> grade at the end of the marking period so that she would pass and we talked
> about, you know, that would maybe be necessary in other class -- classes,
> but algebra two specifically the teacher was really expecting pre-algebra to
> algebra one skills close to algebra two skills in the classroom. 2T59:19-61:2.

Mr. Scott also testified that he felt she needed the resource room when he stated:

> Based on the results of the evaluations and the feedback from teachers A.[S.]
> really required a lot of one- to-one support. She required a slower pace of
> instruction. She required a more systematic approach to her teaching, more
> specialized instruction. She required a modified curriculum and you know, I
> thought it was important that she could feel successful academically because
> she definitely was frustrated with the in-class resource and it -- it was hard
> for her. 2T61:3-13.

Mr. Scott also testified that with regard to the evaluations conducted by the district

in 2018 that "[s]ince it had been such a long time since A.[S.] was evaluated I did

not include any previous evaluations in my report because no meaningful comparisons could be made, but we do overall look at the student's educational record. As part of the evaluation, we also do a classroom observation. So I observed A.[S.] in one of her classes and then I interviewed her." 2T30:7-32:3. He also testified that, "Overall A.[S.] presented with limited insight into her current educational functioning. She had limited ability to maintain a reciprocal conversation. Eye contact was inconsistent." 2T33:18-34:5. Mr. Scott noted "[A]t this point when students are in high school they're no longer learning to read. They're reading to learn. So reading comprehension is an essential aspect of a student's success at the high school level. So the scores were concerning to me because they fell at the point-third .03 percentile which indicates that her scores were only higher than point-three (.03) percent of students her age." 2T38:4-15. Mr. Scott's testified that "overall it suggests global deficits in reading -- reading -- in all areas of reading comprehension, fluency, decoding, phonics, phonemic awareness. So based off of that I assessed her reading skills to be between a second and third grade level and that would mean that there would need to be some type of reading intervention put into place to make up for those deficits." 2T39:10-19. Moreover, he testified that **"A.[S.] had global deficits in -- in math, she lacked basic understanding of numerical operations and -- and basic skills in math which would lead her to find more challenging math classes like algebra two**

**to be nearly impossible due to the -- the skill set that's required to be -- to -- to -- to succeed in that class."** 2T44:6-13. (emphasis added). He further testified that his testing results "indicate that a student would have significant difficulty accessing the general education curriculum and would need significant modifications, supports and supplemental aids and programming to be successful." 2T45:20-46:1.   Mr. Scott also testified that, "[w]e didn't want to disrupt the program at that time and then also at that time A.[S.]'s parents indicated that they would continue to support her outside of school through private tutoring. **So at that point despite the fact that we did not think that it was an appropriate program we did offer an in-class resource program** with additional modifications contingent on the inclusion of speech therapy and A.[S.] kind of stepping up academically and being willing to accept support and be more invested in the process." 2T58:5-59:6 (emphasis added). **Mr. Scott confirmed that he was aware based on his own evaluation that in class support in a general education classroom was not an academically appropriate placement for A.S. 2T100:23-101:2.** (emphasis added) Mr. Scott reviewed the reading goals of Exhibit P-7 (corresponding Exhibit R-9), the October 24, 2016 IEP, and confirmed that it said A.S. should be reading at an 8th grade level. 2T118:23-119:11. Mr. Scott confirmed that he did not believe that A.S. could achieve the reading goals because it has her reading at a level much higher than what she was at. 2T119:21-25. Mr. Scott

confirmed on cross examination that it was accurate to say that in 2011 she was reading at a first-grade level, in 2016 she was reading at a mid-third grade level, and in 2018 she went down to reading at a second and third grade level. 2T122:7-13. Mr. Scott confirmed that his review of the progress reports for each of those school years shows that A.S. did not meet any of the goals and objectives in her IEPs from 2016-2019. The reports also specifically stated that A.S. did not meet any of her math goals and objectives in those years. 2T124:1-128:3.

Mr. Scott also testified about the behavior plan in A.S.'s June 12, 2018 IEP. He testified that the purpose of the behavior plan was to reduce anxiety in school and to deal with school avoidance and task avoidance. 2T129:6-16. Mr. Scott confirmed that the behavior plan said that A.S. "tends to remove herself from a class to avoid a stressful situation. She finds the school environment to be overwhelming, specifically the volume of students, the perception that she's not capable of succeeding in the classroom setting, A.[S.]'s tendency to try to…avoid school is a result of her anxiety about these matters." 2T129:17-130:1. When asked why the behavior plan was removed when A.S. was still having anxiety and avoidance issues Mr. Scott said: "So the behavior plan was not targeted at the same behavior that I saw." 2T130-23 to 24.  When Judge Crowley asked Mr. Scott if he thought the district could provide an appropriate education to someone without evaluations, he stated, "I think that it's definitely an essential component of the IEP

and an essential component of planning. It makes it difficult in my -- when there's not updated evaluations. So yes." 2T167:19-168:5. Mr. Scott's testimony was detrimental to the district because he admitted the failures by the district in not providing A.S. with an appropriate program that would meet all of her needs and include all of her known disabilities. He confirmed A.S. was denied FAPE.

As Judge Crowley determined, the district was unable to sustain its burden of proof in that its own case manager, Connor Scott, admitted during his testimony that the district provided an IEP for A.S. that he knew did not provide her with a free and appropriate public education (FAPE) in the least restrictive environment (LRE). He stated on page 5 of the actual proposed IEP dated December 6, 2018, (P15) which placed A.S. in all in class resource general education classes that:

> [A.S.'s] very low to low scores in the areas of Broad Reading, Reading Comprehension Extended, Broad Written Language, Broad Mathematics, Academic Skills, Academic Fluency, Academic Applications, and Broad Achievement **suggest that she will have great difficulty accessing the general education curriculum even with modifications and accommodations put into place.** Consideration should be given to revising [A.S.'s] special education program to allow for her participation in classes that will address her significant deficits in the broad curricular areas. (emphasis added). 2T133-13 to 19.

Connor Scott admitted that despite offering A.S. an IEP that placed her in all general education classes, he knew that this placement would not have met her needs and denied her FAPE in the LRE. This alone demonstrates that the district knew that it did not provide A.S. with a thorough and appropriate education.

Despite not having any speech and language therapy in school or even being evaluated for speech and language services by the district since 2007, knowing that A.S. was classified as communication impaired, the district only provided A.S. with group speech therapy 1 time per week for 23 minutes starting in the December 6, 2018 IEP. Then the case manager, knowing that A.S. needed speech and language therapy, suggested that she move into a consultative model, which would not actually provide her speech and language services, instead of addressing or recognizing A.S.'s disabling anxiety issues.

The testimony at the due process hearing supports Judge Crowley's decision. When Ms. Emert was asked if the district had performed a triennial evaluation she said, "What I was aware of is that at the time that I had recommended a re-eval planning meeting was three years from the previous one that she had a meeting for, but I don't –- according to what's documented in this IEP, it does not appear that she was tested. It doesn't mean that there weren't meeting where it was offered, it simply means that she wasn't tested." 1T102:3-12. Ms. Emert confirmed that according to the IEP the last speech and language evaluation performed on A.S. was in 2007. 1T102:16-19. Ms. Emert confirmed that when she was a case manager several IEPs were amended without an IEP meeting. 1T102:20-23. Also, while she was a case manager no speech and language therapist ever attended any of A.S.' IEP meetings. 1T102:24-103:2. Ms. Emert confirmed that in the PLAAF

section of the IEP teachers had said that A.S. was struggling "In her in-class settings, yes. In the general ed setting with in-class support." 1T103:3-8. Ms. Emert confirmed that despite the fact that A.S. was struggling, while she was case manager A.S.'s placement changed from pull out replacement classes to general education classes at the request of the parents. 1T103:9-13.

Plaintiff's appeal is essentially premised on the district allegedly offering programs that the parents rejected, and therefore, the district falsely claims it cannot be held to have denied A.S. FAPE in the LRE because it gave the parents what they wanted. Plaintiff's theory is incorrect and not based on facts. At no time did the parents "obstruct the District's attempt to procure for A.S. an appropriate educational program and placement" as asserted by the district on page 10 of its Complaint. [EFC Doc. No. 1, page 10]. The district failed to present any evidence to show that it offered speech services to the parents in writing or orally. There was no speech evaluation for eleven years between 2007 and 2018, that could have outlined what speech services A.S. needed and what the district was willing to offer, and the district never filed for due process regarding any IEP or lack of speech services to A.S.  The district not the parents, had the legal obligations to provide A.S. with FAPE in the LRE and if the district at any time felt that the parents were not cooperating or obstructing the district's efforts, it had an obligation to file for due process and it failed to do so. The district knew it was not

providing A.S. with an appropriate educational program and placement and that it failed to obtain any waivers from A.S.'s parents when it did not conduct triennial evaluations of A.S. for at least nine (9) years. The district knew that A.S. was classified as Communication Impaired and yet, the district failed to provide her with speech and language services and admitted it relied upon A.S.'s parents obtaining private speech therapy. ECF Doc. No. 9, Att. 15- 3T190:21-191:4; Certification of M.S., Paragraph 12. The district was aware that A.S. was more socially and emotionally advanced than the students in the self-contained class and she was bullied and physically assaulted in that class. 3T145:3-20. A.S. did not see herself as disabled, even though she also had a physical injury and multiple surgeries for same and she had issues with her eyes. However, by placing her in the general education classes, the district did not meet her needs either, as admitted by Mr. Scott. The district failed to fulfill its obligations under the IDEA.

Judge Crowley analyzed the district's IEPs and determined the following:

Thus, the first issue is whether the District's IEP provided FAPE to A.S. The witnesses for the District failed to demonstrate that the IEPs were provided any meaningful educational benefit to A.S. However, the testimony of petitioners' expert, whom I found credible, as well as A.S.' mother demonstrates that the educational needs of A.S. were not being addressed by the District in her IEP, and A.S. was having significant academic troubles, as well as some social and emotional issues. There was significant testimony from the District about testing which was ultimately done and the IEPs which further solidified the fact that A.S. was not receiving FAPE in the District. The IEPs for the past several years in district failed to provide specific goals and objectives on a social, emotional and academic level which would provide a significant and meaningful

educational benefit to A.S. **Although, the District was trying to accommodate the desire of A.S. to stay with friends and not feel isolated, the goal is to provide FAPE in the LRE, not to make her and/or her parents happy.** If the parents did not agree with the proposed IEP, they have the right to file for due process. It appears that in an effort to avoid litigation and make the parents and happy, the proposed IEP failed to confer any meaningful educational benefit to A.S. Finally, given the fact that A.S. was struggling, which was evident from her grades, the District had an obligation to conduct evaluations and provide an IEP that provided some meaningful educational benefits. No evaluations were provided for almost nine years and no waiver of evaluations was obtained from the parents. Accordingly, I **CONCLUDE** that the District failed to provide FAPE to A.S.

\*\*\*

I **FIND** as **FACT** that the District has failed to demonstrate that they provided an IEP which provided some meaning education benefit, reasonable goals and objectives and provided FAPE in the LRE. I further **FIND** that in order to accommodate the desires of the parents, and perhaps avoid litigation the District lost sight of its obligation to provide an IEP which provided A.S. with a meaningful educational benefit. I further **FIND** that the District IEPs for the past several years were not reasonably calculated to provide any meaningful educational benefit to A.S. and failed to provide FAPE. (emphasis added) [ECF Doc. No. 3].

Judge Crowley further stated on page 14 of Her Honor's Final Decision:

Although the IEP should set forth a statement of the present levels of academic achievement and functional performance, including how the student's disability affects involvement and progress in the general curriculum [20 U.S.C. §1414(d)(1)(A)(i)(I); N.J.A.C. 6A:14-3.7(e)(1)], there was no such clear statement in the IEP. Although there should be a statement of measurable annual academic and functional goals with short-term objectives or benchmarks and the IEP should describe a program of individually designed instructional activities and related services necessary to achieve the stated goals and objectives [20 U.S.C. §1414(d)(1)(A)(i)(II)-(IV); N.J.A.C. 6A:14-3.7(e)(2)-(4)], those were not clear in A.S.' current or proposed IEP. Although the IEP should establish the rationale for the pupil's educational placement, the IEPs in this case did not. In fact, the testimony from the District's own witnesses was that the petitioner's placement was not proper. Accordingly, I further **CONCLUDE** that the IEPs in question

did not provide any meaningful educational benefit and thus, resulted in a denial of FAPE. [ECF Doc. No. 3].

Therefore, it is clear that from Judge Crowley's analysis of the credibility of the witnesses and the evidence presented that Her Honor's decision was correct and that A.S.'s parents were the prevailing party. Plaintiff's appeal must be denied.

**POINT III- THE DISTRICT IS INCORRECT WHEN IT STATES THAT JUDGE CROWLEY GAVE LITTLE WEIGHT TO THE DISTRICT'S INDEPENDENT PROFESSIONALS AND OVERLOOKED MUCH OF THE RELEVANT TESTIMONY**

As stated herein, Judge Crowley did in fact analyze the credibility of the district's witnesses and determined that they were not credible. For example, on page 4 of Her Honor's Final Decision, it is noted with regard to Mr. Scott, "He conceded that in class support in a general education class was really not enough for A.S. He was also aware that she had no speech services for eighth and ninth grade. He conceded that she had not been meeting her goals and objectives." Judge Crowley also noted on pages 4-5 of Her Honor's Final Decision about Mr. Scott:

> He thought that if the parents refused to consent to the reevaluations, that they were not obligated to do them. The parents had some problems with the proposed IEP, so they made changes to accommodate their requests. He discussed some of the test results from his educational evaluations which confirmed the very low range in most critical areas…Mr. Scott was unclear why they had not done any evaluations for so long. He believed it was because the parents wanted to wait. Yet, there was no waiver from the parents or anything to document that the parents had refused to consent or produce her for testing or that they had waived the evaluations. He believed that that a resource room placement was the appropriate placement for her, but she was not put in the resource room. He went over some of the IEPs during his testimony which confirmed that A.S. was not reaching her goals

and was reading at a very low level. The low level of her reading abilities was confirmed when she was evaluated in 2018. He went though some prior assessment which confirmed her below average testing levels. She continued to be passed on to the next level despite her failure to meet any of her goals and objectives. [ECF Doc. No. 3].

With regard to Ms. Emert's testimony, she did not recall too many specifics despite being A.S.'s prior case manager. Judge Crowley noted on page 3 of Her Honor's Final Decision that Ms. Emert did not know why there were no evaluations.

> [Ms. Emert] felt the pullout would have been better, but the parents and A.S. did not want her pulled out, and the mom withdrew her from speech and language pull out. She does not recall why, but she thinks it was because there was a stigma attached to being pulled out and A.S. did not want to be pulled out. Until the very recent evaluations that were done, the last evaluations were done in 2008.
> …
> Ms. Emert identified and discussed the 2016 IEPs but does not recall meeting with the parents. The related services were not to be provided per discussion with parents because they advised that they were providing them privately. She does not know if she was actually getting these services privately. In June of 2017, at the end of eighth grade, there was a re-evaluation planning meeting. An education and psych evaluation were proposed but the parents did not consent to the proposed evaluations. She does not know if they ever got a waiver and they did not file for due process over the issue. (Judge Crowley's Final Decision, page 3).

It is clear from the record and Judge Crowley's Final Decision that the district's witnesses' testimony contradicted the actual documents such as the IEPs presented at the hearing. Judge Crowley's credibility determinations must stand. Plaintiff's appeal must be denied as there is no non-testimonial evidence that contradicts Judge Crowley's findings and Plaintiff's bald assertions are not sufficient.

Plaintiff also makes baseless assertions that Judge Crowley erred by failing to consider the testimony of Rosalia Minervini and not allowing Jennifer Garcia to testify. However, Judge Crowley specifically stated with regard to Ms. Minervini:

> Rosella Minervini (Minervini), is a supervisor in the District but was not there at the time petitioner was there. However, she was the supervisor for the child study team that prepped the 2018 IEP for petitioner. Ms. Minerva discussed the IEP which continued with A.S.' classification as communication handicapped. She confirmed that A.S. had severe academic and language issues and would be a candidate for an LLD class. However, she had no firsthand knowledge of A.S., and never met with her. They did not have a final IEP and thus, no report from this witness. The proposed IEP that she mentions in her testimony was never presented to the parents and no IEP meeting was ever conducted, due to the fact that the child had already been unilaterally placed over the objection of the District. [ECF Doc. No. 3].

Whether or not Ms. Minervini had credentials as a supervisor was not relevant in this case because she did not know A.S. and the program that was supposed to be proposed for A.S. for the 2020-2021 school year was never presented to the parents because the district cancelled the IEP meeting and never rescheduled it. 2T195:12-17. Specifically, Ms. Minervini testified that she was never a child study team member or a supervisor when A.S. was at the high school, She never wrote an IEP for her, she had no personal or firsthand knowledge of A.S. or her program and placement in the high school, only access to her files without a signed waiver to view those files, and she confirmed that A.S. was never offered an LLD program at the high school. See 2T235:23-236:9, 2T233:11-16, 2T236:10-237:4, 2T237:512. In fact, Judge Crowley, among other things, stated,

> So I'm -- I'm not going to exclude this witness, but I'm going to reserve on what weight if any I give it based on going forward and I'm happy to have you guys brief that issue, but it -- it is a little unusual that there was no even child study team meeting. There wasn't a proposed IEP and she's going to testify about a proposed IEP that was not even proposed yet. So that's a little awkward. 2T199:9-16. [ECF Doc. No. 3].

Thus, whatever the apparent program was supposed to be, which is what she testified about, was not an actual proposed program and it was not incorporated into an IEP or even discussed with A.S.'s parents, as Ms. Minervini came into the district after A.S. had been unilaterally placed for more than a year. The law is very clear that Judge Crowley could only consider the programs offered not what could have been offered. Lascari v. Board of Education of the Ramapo Indian Hills Regional High School District, 116 N.J. 30, 46, 560 A.2d 1180 (1989).

Similarly, Judge Crowley did not allow Jennifer Garcia, the district's speech and language pathologist to testify because again, she never met A.S., never implemented a program or tested her, and the proposed program for the 2020-2021 school year that the district wanted Ms. Garcia to testify about was never presented to A.S.'s parents and it was never incorporated into an IEP because the district cancelled the IEP meeting and never rescheduled it. In addition, Ms. Garcia confirmed that any knowledge she has about A.S. is not from firsthand experience and that while A.S. was in the East Brunswick school district Ms. Garcia never had anything to do with her in any way. 1T164:14-21. Ms. Garcia confirmed that her only knowledge of A.S. came from discussions with the district's counsel and child

team study members and she reviewed A.S.'s student records. 1T165:1-7, but she did not have a signed consent form from Defendants/Counterclaimants giving her the right to review A.S.'s records. 1T165:8-11. Thus, Judge Crowley was correct in not allowing her to testify as Her Honor could only determine if the actual programs and placements offered conferred FAPE, not a future non-existent one.

**POINT IV-THE DISTRICT FAILED TO MEET ITS BURDEN OF PROOF, THE IEPS WERE NOT APPROPIATE AND IT DENIED A.S. FAPE**

In a due process action, pursuant to N.J.S.A. Section 18A: 46-1.1, the district has the burden of proof and production to show that it provided a free and appropriate public education (FAPE) in the least restrictive environment (LRE). "[I]t is quite clear that when a change in a child's IEP is sought, regardless of whether the party seeking the change is the school district or the parents, the burden of showing that the placement is "appropriate" rests with the school district. Lascari v. Board of Education of the Ramapo Indian Hills Regional High School District, 116 N.J. 30, 560 A.2d 1180 (1989); See also Fuhrmann v. East Hanover Bd. of Educ., 993 F. 2d 1031, 1034-1035 (3d Cir. 1993). It is well-established that, "the obligation of parents at the due-process hearing should be merely to place in issue the appropriateness of the IEP." Lascari, supra, 116 N.J. at 46. The burden then shifts to the school district to prove that the "IEP was appropriate." Ibid. "[I]n determining whether an IEP was appropriate, the focus should be on the IEP actually offered and not on one that the school board could have provided if it had

17

been so inclined." Ibid. Additionally, no deference is to be accorded to a New Jersey
School's decision. "The proposed action of the board of education or public agency
shall not be accorded any presumption of correctness." N.J.A.C. Section 1:6A-14.1
(d). The Supreme Court has further recognized that "the purpose of the IEP is to
guide teachers and to ensure that the child receives the necessary education."
Lascari, supra, 116 N.J. at 48 (internal citations omitted).   As such, "school
personnel, in consultation with the child's special education teacher, shall determine
the level of educational services required for the student to appropriately progress in
the general curriculum and appropriately advance toward achieving the goals set
forth in the child's IEP." Baer v. Klagholz, 339 N.J. Super. 168, 208 (App. Div.
2001) (quoting 34 C.F.R. § 300.12(d)(3)(i)).   "Without an adequately drafted IEP, it
would be difficult, if not impossible, to measure a child's progress, a measurement
that is necessary to determine changes to be made in the next IEP." Lascari, supra,
116 N.J. at 48.   Further, "an IEP that is incapable of review denies parents the
opportunity to help shape their child's education and hinders their ability to assure
that their child will receive the education to which he or she is entitled." Id. at 49.

In addition, when parents challenge a school's provision of a FAPE to a
child, a reviewing court must (1) consider whether the school district complied
with IDEA's procedural requirements and (2) determine whether the educational
program was "reasonably calculated to enable the child to receive educational

benefits." <u>Bd. of Educ. v. Rowley</u>, 458 U.S. 176, 206-07, 102 S. Ct. 3034, 73 L. Ed. 2d 690 (1982); <u>See also</u> <u>Mary Courtney T. v. Sch. Dist.</u>, 575 F.3d 235, 249, 2009 U.S. App. LEXIS 17001, *32 (3d Cir. Pa. 2009); (See also the updated standard set forth in the <u>Endrew</u> case).  In some cases, a procedural violation can rise to the level of a denial of FAPE but only if "such violation causes substantive harm to the child or his parents." <u>C.H. v. Cape</u> <u>Henlopen Sch. Dist.</u>, 606 F.3d 59, 66 (3d Cir. 2010) (<u>citing</u> <u>Knable ex rel. Knable v. Bexley City</u> <u>Sch. Dist.</u>, 238 F.3d 755, 765 (6th Cir. 2001)). Substantive harm occurs if the preponderance of the evidence indicates that:

> [T]he procedural inadequacies— (I) impeded the child's right to a free appropriate public education; (II) significantly impeded the parents' opportunity to participate in the decision-making process regarding the provision of a free appropriate public education to the parents' child; or (III) caused a deprivation of educational benefits. 20 U.S.C.  § 1415(f)(3)(E)(ii); *accord* 34 C.F.R. § 300.513(a)(2); N.J.A.C. §6A:14-2.7(k)" See <u>C.H. v.</u> <u>Cape Henlopen Sch. Dist.</u>, 606 F.3d 59, 67 (3d Cir. 2010); <u>D.C. v. Mount</u> <u>Olive Twp. Bd.</u> <u>of Educ.</u>, 2014 U.S. Dist. LEXIS 45788, *50-51, 2014 WL 1293534 (D.N.J. Mar. 31, 2014).

Moreover, the United States Supreme Court in <u>Endrew F. v Douglas County</u> <u>School District</u>, 137 S. Ct. 988 (2017), has made it clear that a "basic floor of opportunity" is an insufficient yard stick to determine whether the district has provided a FAPE to a disabled student. Therein, the Court focused stated:

> To meet its substantive obligation under the IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances. The "reasonably calculated" qualification reflects recognition that crafting an appropriate program of education

requires a prospective judgment by school officials.  The Act contemplates that this fact-intensive exercise will be informed not only by the expertise of school officials, but also by the input of the child's parents or guardians. Id., at 11. See also <u>Board of Education of Hendrick Hudson Central School Dist.,</u> <u>Westchester Cty. V. Rowley,</u> 458 U.S. 176, 207 (1982).
* * *

It cannot be the case that the Act typically aims for grade- level advancement for children with disabilities who can be educated in the regular classroom but is satisfied with barely more than *de minimis* progress for those who cannot. When all is said and done, a student offered an educational program providing "merely more than *de minimis*" progress from year to year can hardly be said to have been offered an education at all. For children with disabilities receiving instruction that aims so low would be tantamount to 'sitting idly… awaiting the time when they were old enough to "drop out.'…The IDEA demands more. <u>Endrew</u>, <u>supra</u>, 137 S. Ct. at 999-1001 (internal citations omitted).

In the present case, A.S. failed to make even de minimis progress with her IEPs and in fact, she regressed based on her 2018 evaluations. Therefore, the district could not have met its burden of proof that it provided more than de minimis education to A.S. as she failed to make any meaningful educational progress for years. Moreover, the IEP for the 2020-2021 school year, that Ms. Garcia was supposed to testify about, and Ms. Minervini did testify about, did not actually exist as it was never a program offered to the parents and they did not have any ability to review it. Thus, Judge Crowley' assessment of the witnesses' testimony and credibility were correct.

In addition, the parents' expert, Jaime Lehrhoff, testified without contradictory testimony or evidence from the district, that the district's IEP for 2019-2020 was not adequate to meet A.S.'s needs and denied her FAPE in the LRE. The district's own witnesses admitted that A.S. had not had a speech and language

evaluation for 11 years and that no actual speech and language program was offered to her, despite her being classified as Communication Impaired. No triennial evaluation was conducted for nine (9) years. A.S.'s IEPs had not accounted for her ADHD, math disability, reading and writing disabilities, anxiety, and ODD diagnoses or her need for Occupational Therapy, speech, and counseling. As a result, A.S. did not receive any accommodations or goals and objectives directed at these disabilities, thereby denying her FAPE in the LRE. Connor Scott admitted that the program and placement presented to A.S. in her December 6, 2018, IEP was a denial of FAPE in the LRE. Although he then attempted to blame the Defendants/Counterclaimants for trying to ensure that A.S. was socially appropriate, the district cannot rid itself of its legal responsibility to offer A.S. FAPE in the LRE.

Moreover, the district failed to ensure that A.S.'s IEPs were reasonably calculated to enable her to make meaningful progress in light of her circumstances as the district failed to include specially designed instruction to meet her unique needs. Documentary evidence also showed that she did not even make de minimis progress because she actually regressed between 2007 and 2018. Judge Crowley cited to Endrew and noted on page 15 of Her Honor's Final Decision that, "the District was aware that A.S. was failing to make any meaningful progress in the District." [ECF Doc. No. 3]. Thus, Plaintiff's baseless appeal must be denied.

**POINT V-A.S.'S IEPS WERE NOT APPROPRIATE WHEN THEY WERE DRAFTED EVEN UNDER THE SNAPSHOT RULE**

The snapshot rule does not apply in this matter and even if it did, Defendants/Counterclaimants still prevail. The snapshot rule should only be applied in a limited capacity, if at all. The Court must look at the information that the school district had or should have had at the time that it drafted the proposed IEP and determine if it was appropriate. This is because "[a]ctions of school systems cannot . . . be judged exclusively in hindsight." Fuhrmann v. E. Hanover Bd. of Educ., 993 F.2d 1031, 1040 (3d Cir. 1993). The Fuhrmann Court cited with approval the First Circuit's observation that "an individual education program ("IEP") is a snapshot, not a retrospective." Id. (citing Roland M. Concord School Committee, 910 F.2d 983, 992 (1st Cir. 1990)). Thus, "[i]n striving for 'appropriateness,' an IEP must take into account what was, and was not, objectively reasonable when the snapshot was taken, that is, at the time the IEP was drafted." Ibid. It is important to note that,

> The IDEA requires that every IEP include "a statement of the child's present levels of academic achievement and functional performance," describe "how the child's disability affects the child's involvement and progress in the general education curriculum," and set out "measurable annual goals, including academic and functional goals," along with a "description of how the child's progress toward meeting" those goals will be gauged. §§ 1414(d)(1)(A)(i)(I)-(III). The IEP must also describe the "special education and related services ... that will be provided" so that the child may "advance appropriately toward attaining the annual goals" and, when possible, "be involved in and make progress in the general education curriculum." See § 1414(d)(1)(A)(i)(IV); See Endrew, infra.

In the present case using the snapshot rule, the Court must examine the information that the district had available to it at the time that it drafted the various IEPs for A.S. For 9 years, A.S. was not evaluated by the district, A.S. had been classified as communication impaired since preschool and yet, had not been evaluated for speech and language services for 11 years, she had not been provided with any plan to provide said services, and had not received any said services. A.S.'s classification did not incorporate her other disabilities, of which the district knew about but failed to incorporate into her IEPs. A.S. was also not provided with Occupational Therapy, which the district was aware that she needed. A.S. had a behavior plan in several of her IEPs yet, she was never evaluated by a BCBA or received a Functional Behavioral Assessment. The case manager wrote the behavioral plan. At the time that all of these IEPs were drafted, the district knew or should have known that they did not have sufficient information about A.S.'s abilities and needs to even present a program. No changes were made to her IEPs that would have provided her with FAPE in the LRE. Thus, applying the snapshot rule, it is clear that at the time that the district drafted all of A.S.'s IEPs, the relevant information needed to actually meet A.S.'s needs academically, socially, emotionally, and physically were missing, thereby denying her FAPE in the LRE, as the program and placements presented did not meet her needs and denied her a thorough and efficient education. As a consequence, these violations, taken

individually and cumulatively, and even through the snapshot rule, reveal procedural and substantive violations that denied A.S. her rights under the IDEA, and denied A.S. a FAPE in the LRE.

## POINT VI-THE DISTRICT FAILED TO EVALUATE A.S. IN ALL AREAS OF SUSPECTED DISABILITIES AND COMMITTED PROCEDURAL AND SUBSTANTIVE VIOLATIONS

Pursuant to the IDEA and N.J.A.C. 6A:14-2.5 (b)(3), (4), and (7), the District was required to ensure that A.S. was assessed in all areas of suspected disability, to use a variety of assessment tools and strategies that provided relevant information that directly assisted them in determining the educational needs of A.S., and that their evaluation of A.S. was sufficiently comprehensive to identify all of A.S.'s special education and related service needs, whether or not commonly linked to the suspected eligibility category. See P.P. v. W. Chester Area Sch.Dist., 585 F. 3d 727, 730 (3d Cir. 2009) (citing 20 U.S.C. § 1414(b)); See also Section 300.304. The IEP must also consider any evaluations and reports obtained by the parents or the school district.  20 U.S.C. § 1414(b)(2)(A); 34 C.F.R. § 209.300.304(b)(1); N.J.A.C. 6A:14-2.5(a)(1), 2.5(c)(5) 210 and 3.4(i). See 20 U.S.C. § 1415(b)(6)(A), See also V.M. ex rel B.M. v. Sparta Twp. Bd. of Educ., 2014 U.S. Dist. LEXIS 91254.

To classify a student, "New Jersey's regulations go one step farther, providing that "[c]lassification shall be based on all assessments conducted including

assessment by child study team members and assessment by other specialists as specified below." N.J.A.C. § 6A:143.5(c) (emphasis added). V.M., at 10. In order to determine if a student is eligible for special education services under the IDEA, "the eligibility determination process has two essential stages: (1) the evaluations and written reports, and (2) the eligibility determination meeting." V.M. ex rel B.M. v. Sparta Twp. Bd. of Educ., 2014 U.S. Dist. LEXIS 91254 *5. "Each IEP must include an assessment of the child's current educational performance, must articulate measurable educational goals, and must specify the nature of the special services that the school will provide." Blunt v. Lower Merion School Dist., 767 F. 3d 247, 268 (3d Cir. 2014); See also 34 C.F.R. 300.303 (requiring a reevaluation every three years); 34 C.F.R. 300.304-300.311.

The least restrictive environment was defined by the Court in Shore Reg'l High Sch. Bd. of Educ. v. P.S., 381 F. 3d 194, 198 (3d Cir. 2004):

> '[T]o the maximum extent appropriate, children with disabilities…are [to be] educated with children who are not disabled' and that children with disabilities are not to be placed in special classes or otherwise removed from 'the regular educational environment' except when 'the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.' Id., citing 20 U.S.C. 1412 (a)(5).

Furthermore, Courts in this jurisdiction have adopted a two-part test for assessing compliance with the Least Restrictive Environment requirement.

> First, the Court must determine 'whether education in the regular classroom, with the use of supplementary aids and services, can be achieved

satisfactorily.' […] Second, if the Court finds that placement outside of a regular classroom is necessary for the child's educational benefit, it must evaluate 'whether the school has mainstreamed the child to the maximum extent appropriate, i.e., whether the school has made efforts to include the child in school programs with nondisabled children whenever possible.' T.R. Ex rel. N.R., 205 F.3d at 579, quoting Oberti v. Board of Educ. Of Borough of Clementon Sch. Dist., 995 F. 2d 1204, 1215 (3d Cir. 1993).

The district failed to evaluate A.S. in all areas of suspected disabilities for years. The district could not develop an appropriate IEP without said evaluations. Based on the 2018 evaluations, A.S. had regressed demonstrating that the district's program and placement for years had not met her needs. The IEPs implemented by the district were not based on accurate data and information and they did not include or address her other disabilities. Therefore, the district could not possibly have provided A.S. with FAPE in the LRE.  The proper measure must be whether or not taking all of A.S.'s disabilities, did the district offer an appropriate program to the maximum extent possible with general education students. Here, the district did not appropriately address A.S.'s special education needs and disabilities, and A.S. did not make any significant learning or gain any meaningful benefit from her education, and in fact, she regressed. Therefore, the district failed to provide FAPE in the LRE. The district failed to present any documentary or testimonial evidence to contradict Defendants/Counterclaimants' evidence. Thus, Judge Crowley's decision was proper and Defendants/Counterclaimants' motion for summary judgment must be granted, and Plaintiff's motion and appeal be denied.

The district's case managers both admitted that the district failed to conduct triennial evaluations of A.S., speech and language evaluations, functional behavioral assessments, occupational therapy assessment, educational, social, and psychological assessments, despite known diagnoses regarding such. Ms. Lehrhoff had testified that she felt that A.S. needed to go back to the basics and start from there as she missed so much education for such an extended period of time. Despite the district's obligations, as Judge Crowley noted, the district failed to provide FAPE in the LRE. Thus, this Court must affirm Judge Crowley's decision, grant Defendants/Counterclaimants' motion and deny Plaintiff's motion.

**POINT VII-A.S. IS ENTITLED TO COMPENSATORY EDUCATION**

The Third Circuit has held that "`[a] disabled student's right to compensatory education accrues when the school knows or should know that the student is receiving an inappropriate education.'" <u>P.P., 585 F.3d at 739</u> (quoting <u>Lauren W. ex rel. Jean W. v. DeFlaminis, 480 F.3d</u> <u>259, 272 (3d Cir.2007)</u>). When a school fails to correct a situation in which a disabled student "is not receiving more than a *de minimis* educational benefit," the "child is entitled to compensatory education for a period equal to the period of deprivation, excluding only the time reasonably required for the school district to rectify the problem." <u>M.C. ex rel. J.C. v. Cent. Reg'l Sch.Dist., 81 F.3d 389, 391-92 (3d Cir.1996)</u>. See <u>P.P. ex rel. Michael P. v.</u>

W. Chester Area Sch. Dist., 585 F.3d 727 (3d Cir.2009); See D.K. v. Abington

School Dist., 696 F. 3d 233, 249 (3dCir. 2012). As the Court in Batchelor noted,

> [a]ppropriate remedies under the IDEA are determined on a case-by-case
> basis. "In each case, a court will evaluate the specific type of relief that is
> appropriate to ensure that a student is fully compensated for a school
> district's past violations of his or her rights under the IDEA and develop an
> appropriate equitable award." Batchelor, page 277

Compensatory education is an award of certain educational services intended to

redress a previous deprivation of educational services to which a child is entitled.

M.C. on behalf of J.C.v. Central Regional School District, 81 F.3d 389, 395 (3d.

Cir. 1996), cert. den, 519 U.S. 866 (1996). In assessing compensatory education,

appropriate relief is designed to ensure that the student is appropriately educated

within the meaning of the IDEA.

In the present case, Judge Crowley Ordered the district to provide 50 hours

of compensatory education, but the district failed to do so. The case managers

admitted that A.S. was denied FAPE in the LRE, entitling A.S. to compensatory

education. Starting in 2007, A.S. was not provided with speech and language

services, reading and math instruction, her classification did not incorporate all of

her known disabilities, and she did not have occupational therapy or counseling.

Between 2007-2018, the district knew or should have known that it failed to

perform triennial evaluations and she was not evaluated for eleven years, in the

very area in which she was classified. The district failed to include her other

diagnoses and disabilities in her IEPs and her classification was not changed to Other Health Impaired. A.S. had not achieved any of her IEP goals and objectives for years and her placement was not appropriate. Thus, A.S. is entitled to compensatory education.

## POINT VIII- THE DISTRICT IS NOT CORRECT WHEN IT ASSERTS THAT JUDGE CROWLEY FAILED TO APPLY EQUITABLE CONSIDERATIONS TO WARRANT DENYING OR REDUCING TUITION REIMBURSEMENT

The district's positions are contrary because it first asserted in its Complaint that the parents consented to the IEPs and now on page 11 it asserts that "Parents' actions demonstrated that they were never willing to consider the District's offer of FAPE." [ECF Doc. No. 1, page 11]. The district's citation to N.J.A.C. 6A:14-2.19 (c)(1) and (2) is wrong. The correct citation is N.J.A.C. 6A:14-2.10 (c)(1)-(c)(4):

> (c) The parents must provide notice to the district board of education of their concerns and intent to enroll their child in a nonpublic school at public expense. The cost of reimbursement described at (b) above may be reduced or denied:
>
> 1. If, at the most recent IEP meeting that the parents attended prior to the removal of the student from the public school, the parents did not inform the IEP team that they were rejecting the IEP proposed by the district board of education;
>
> 2. If, at least 10 business days (including any holidays that occur on a business day) prior to the removal of the student from the public school, the parents did not give written notice to the district board of education of their concerns or intent to enroll their child in a nonpublic school;
>
> 3. If, prior to the parents' removal of the student from the public school, the district board of education proposed a reevaluation of the student and provided notice pursuant to N.J.A.C. 6A:14-2.3(g) and (h), but the parents did not make the student available for the reevaluation; **or**

    4. Upon a judicial finding of unreasonableness with respect to actions taken by the parents.

Although the district attempts to mislead the Court about what these Code provisions say, it is clear from the actual Code that (c)(1) and (2) do not have to both be met and that there is an "or" listed for (c)(1)-(4).

    In the present case, the parents gave proper 10-day notice of a unilateral placement and after receiving said notice and before A.S. was unilaterally placed, the district failed to propose a reevaluation of A.S. so there was no issue of the parents making A.S. available for same. There was also no judicial finding of unreasonableness with respect to the parents' actions. However, with regard to the most recent IEP meeting held on December 6, 2018, Mr. Scott testified that A.S.'s placement was not changed in the December 6, 2018 IEP. He confirmed that she remained in the general education class even though A.S.'s mother had expressed concern and a desire to move her to the resource room in September. 2T150:24-151:7. When Judge Crowley asked about the IEP, Mr. Scott said, "Because at that time of the October or the December 2018 meeting, we proposed that she would go into a resource math class that focused on functional math skills and that was rejected at that time. I do believe there was a conversation and there were many conversations about math. It was not within the context of an IEP meeting." 2T151:8-22. Mr. Scott confirmed that through parental report he was aware that behaviors of others in the resource room triggered behaviors in A.S. He also

confirmed that it was stated in the IEP.   2T153:19-154:4. Mr. Scott reviewed

Exhibit P-49, email correspondence with Mrs. S. He confirmed that an October 2,

2018, email discussed that A.S.'s math teacher shared that A.S. was upset in class.

Also, the email noted that the math class now had an in-class support teacher.

2T154:9-16. This meant that prior to October 2018, the math class did not have an

in-class support teacher.  In an October 9, 2018 email Mr. Scott confirmed with

regard to a possible change to A.S.'s schedule that, "I'm concerned that making

this -- that move because if A.S. does continue to struggle with algebra two and we

consider a move to resource it might mean moving her whole schedule again which

might be disruptive to A.S.'s learning given her difficulties with transition."

2T154:22-155:8. Instead, he allowed A.S. to remain in algebra and to struggle in a

class he knew she was not capable of comprehending or succeeding.

In addition, Judge Crowley analyzed and specifically quoted N.J.A.C.

6A:14-2.10 on pages 14 of Her Honor's Final Decision and noted,

> The District was given proper notice of the unilateral placement. Moreover,
> the District was aware that A.S. was failing to make any meaningful progress
> in the District and therefore, **I CONCLUDE** that the unilateral placement by
> the parents at The Lewis School was reasonable." (Judge Crowley's Final
> Decision, page 15). Judge Crowley also noted on page 9 of Her Honor's
> Final Decision, "I further **FIND** that the out of District placement at The
> Lewis School has provided a meaningful education benefit to A.S. and has
> meet her educational and emotional needs and provided FAPE in the LRE. I
> further **FIND** that proper notice of the out of district placement was provided
> by the parents." [ECF Doc. No. 3].

Judge Crowley also stated on pages 13-14 of Her Honor's Final Decision, "Reimbursement is still dependent upon the parents establishing that the unilateral placement provides the pupil with an appropriate education. Burlington, 471 U.S. at 359; Florence County School District Four v. Carter, 510 U.S. 7, 15 (1993). Regarding the appropriateness of Lewis, [Defendants/Counterclaimants] provided documentary evidence of A.S.' progress at The Lewis School and provided testimony that A.S. was indeed demonstrating significant academic progress at same." Based on the specific testimony presented, Judge Crowley stated,

> I therefore **CONCLUDE** as set forth above that due to (1) the failure of the District to provide FAPE, (2) the appropriateness of The Lewis School for A.S., and (3) the parents' notice to the District of their placement, that reimbursement must be granted. N.J.A.C. 6A:14-2.10. Applying the notice requirements of N.J.A.C. 6A:14-2.10(c), reimbursement is appropriate from September 2019, and as long as that placement remains appropriate. The District shall develop an IEP consistent with A.S.' placement at The Lewis School." (Judge Crowley's Final Decision, page 15). [ECF Doc. No. 3].

Therefore, it is clear that Judge Crowley did in fact analyze the issue of notice and since the actual 10-day notices were presented into evidence, Judge Crowley was able to view them for herself. Thus, Plaintiff's appeal must be denied.

Judge Crowley did not find that the parents' actions were unreasonable. Although Plaintiff raises a bald assertion that the parents were unreasonable, there is no evidence presented to suggest or support this. In fact, the district cannot meet the standard of parental "unreasonableness" under C.H. v. Cape Henlopen Sch. Dist., 606 F.3d 59, 71-72 (3d Cir. 2010) which has been defined as:

The reasonableness inquiry focuses not on the parents' subjective intent, but on their actual conduct and its consequences for the timely completion of the evaluation and IEP. And for that actual conduct to be considered reasonable, parents need not prefer the public school or enroll their child there when they have a reasonable basis to believe the placement being offered is inadequate or unsafe—or, as here, where no IEP has been prepared." Id.

The Courts in K. E. & B. E., o/b/o T.E., v. Northern Highlands Regional Board of Education, 2020 U.S. App. LEXIS 39524 (CA3 12/16/20), and F.H. et al., v. West Morris Regional High School Board of Education, 2020 U.S. Dist. LEXIS 230053 (NJ Dist. Ct 12/8/20), outline the procedures for first determining if the district provided FAPE in the LRE and then whether or not the parents' reimbursement for their unilateral placement should be reduced. The Third Circuit pointed out that the unilateral placement procedures are not a mandatory bar to reimbursement but are discretionary and allow instead for reduction of reimbursement for the unilateral placement, only if the Court determines that the parents did not comply with their requirements under the statute.  The holdings in both of these cases, were that interpreting an alleged violation of unilateral placement procedures as a foreclosure to reimbursement was an abuse of discretion. The Courts held that, "The statute, however, requires ten days' notice of the parents' "reject[ion of] the placement proposed by the public agency to provide a [FAPE] to their child, including . . . their intent to enroll their child in a private school at public expense." 20 U.S.C. § 1412(a)(10)(C)(iii). These Courts also noted that the unreasonableness standard applied to the IEP process and not the due process. K.E., at 18, n.6.

Other Courts have upheld similar or the same outcomes. The Court in <u>Upper Freehold Reg'l, Bd. of Educ. v. T.W. & M.</u>, Civil Action No. 09-1847 (JAP), 2011 U.S. Dist. LEXIS 35660 (D.N.J. Mar. 31, 2011) held that the parents' disregard of their obligations to cooperate and assist in the formulation of an IEP is "among the unreasonable action taken by the parents that Congress contemplated when it gave courts the authority to equitably reduce or eliminate tuition reimbursement." <u>Cape Henlopen, 606 F.3d. at 72</u> (citing <u>Forest Grove Sch. Dist. v. T.A., 129 S. Ct. 2484, 2496, 174 L. Ed. 2d 168 (2009)</u>); See also <u>C.G. v. Five Town Cmty. Sch. Dist.,</u> 513 F.3d 279 (1st Cir. 2008). "The IDEA was not intended to fund private school tuition for the children of parents who have not first given the public school a good faith opportunity to meet its obligations." Id. (citing <u>Roland M. v. Concord Sch. Comm., 910 F.2d 983, 995 (1st Cir. 1990)</u>).  The Third Circuit also has held that if a parent filed an untimely petition, that constituted "unreasonable action." <u>Bernardsville Bd. of Educ. v. J.H., 42 F.3d 149, 158 (3d Cir. 1994)</u>. See also <u>Mittman v. Livingston Twp. Bd. of Educ.</u>, No. 09-4754 (DRD), 2010 U.S. Dist. LEXIS 107419 (D.N.J. Oct. 7, 2010). Judge Crowley already determined that the district failed to provide A.S. with FAPE, and that the parents' 10-day unilateral placement notice was appropriate, and there is nothing in the record presented by the district to show the actions of the parents and the IEP process were unreasonable. This is just now being asserted by the district on appeal without any

support for same. Thus, Plaintiff's appeal is without merit or support.

## POINT IX-A.S.'S PARENTS GAVE PROPER 10 DAY NOTICE OF A UNILATERAL PLACEMENT AT THE LEWIS SCHOOL OF PRINCETON

The IDEA requires prior to a unilateral placement by parents, that they provide the school district with 10 days written notice of such if the parents want to seek reimbursement from the public school for said unilateral placement and they must act reasonably. See 20 U.S.C. § 1412 (a)(10)(C), 34 CFR § 300.148, and N.J.A.C. 6A:14-2.10(c).  20 U.S.C. § 1412 provides that the parents of a child with a disability may be entitled to reimbursement from the agency for the costs of enrolling said child in a private school placement if the Court finds that the agency did not provide a free appropriate public education to that child in a timely manner, provided that the parents gave written notice to the public agency that they were rejecting the proposed placement, including an advisement of their concerns and their intent to enroll the child in a private school at the public's expense.  This written notice must be made 10 business days prior to the removal of the child from the public school setting.  One of the express purposes of the IDEA is "to ensure that the rights of children with disabilities and their parents are protected." 20 U.S.C. §1400(d)(2). See also School Committee of Town of Burlington v. Department of Educ. of Mass., 471 U.S. 359, 367 (1985). Among the rights ensured under the IDEA is the right of parents to obtain reimbursement for private

school placement for any period in which the placement proposed by the school authority has violated the IDEA. Id.

The IDEA's unilateral placement notice requirement exists "to give the school district an opportunity, 'before the child is removed, to assemble a team, evaluate the child, devise an appropriate IEP, and demonstrate whether or not a FAPE can be provided in the public schools.'" T.H. ex rel. A.H. v. Clinton Twp. Bd. of Educ., 2006 U.S. Dist. LEXIS 27432, 2006 WL 1128713, at *6 (D.N.J. Apr. 25, 2006). Congress enumerated several factors that must be taken into account, which could affect possible parental reimbursement for unilateral private placements of their child: Parents must give notice about their concerns and intent at the most recent IEP meeting or written notice 10 days before they transfer the child to the private school. Sarah M. v. Weast, 111 F. Supp. 2d 695 (D. Md. 2000); See N.J.A.C. § 6A:14-2.10 (c), See also K.E. and B.E. v. N. Highlands Reg'l Bd. of Educ., 2019 U.S. Dist. LEXIS 189179, *42-43. Prior to removal of the child from the public school, if the public agency informed the parents of its intent to evaluate the child (including a statement of the purpose of the evaluation that was appropriate and reasonable), the parents must make the child available for such an evaluation. A.S.'s parents complied with all of these enumerated factors and are entitled to full reimbursement for their unilateral placement. Ms. S. testified that she and counsel sent timely 10-day unilateral placement letters before A.S. started attending the

Lewis School. They raised concerns about the results of the district's 2018 evaluations and that A.S. had not made progress at school for years, and at no time did the district request to conduct further evaluations of A.S. Judge Crowley also found that Defendants/Counterclaimants' notice was proper. [ECF Doc. No. 3]. Therefore, A.S.'s parents fully complied with their obligations under the law.

Even if Plaintiff now attempts at this late date to argue that Defendants/Counterclaimants did not give proper notice, which would be false and such claim has not been raised to date, Courts have exercised their equitable discretion to permit parents to recover the full or partial cost of reimbursement, despite parents failing to provide timely notice as required under IDEA and the corresponding New Jersey regulation. See, e.g., F.D. v. Holland Twp. Bd. of Educ., 2007 U.S. Dist. LEXIS 49293, 2007 WL 2021782, at *10 (D.N.J. July 9, 2007); See also, W.M. v. Lakeland Cent. Sch. Dist., 783 F. Supp. 2d 497, 505 (S.D.N.Y. 2011). None of this occurred with A.S. In the present case, A.S.'s parents gave proper written notice, and their reimbursement should not be barred or reduced in any manner. Plaintiff's appeal must be dismissed as baseless and unsubstantiated.

**POINT X-DEFENDANTS DO NOT HAVE THE SAME BURDEN OF PROOF AS THE DISTRICT ABOUT THE APPROPRIATENESS OF THEIR UNILATERAL PLACEMENT: THEY MET THAT BURDEN**

The burden of proof at a due process hearing is on the district to show that it provided the student with FAPE in the LRE. Pursuant to Florence County School

Dist. Four v. Carter, 510 U.S. 7 (S. Ct. 1993), the Court noted that when there is a

dispute as to placement, "parents who disagree with the proposed IEP are faced

with a choice: go along with the IEP to the detriment of their child if it turns out to

be inappropriate or pay for what they consider to be the appropriate placement."

Id., at 12; See School Comm. of Burlington v. Department of Ed. of Mass., 471 U.

S. 359, 370 (1985).  Further, the Court held that,

> For parents willing and able to make the latter choice, "it would be an empty
> victory to have a court tell them several years later that they were right but
> that these expenditures could not in a proper case be reimbursed by the
> school officials." *Ibid.* Because such a result would be contrary to IDEA's
> guarantee of a "free appropriate public education," we held that "Congress
> meant to include retroactive reimbursement to parents as an available
> remedy in a proper case." Id., at 12.

Under the IDEA, "it hardly seems consistent with the Act's goals to forbid parents

from educating their child at a school that provides an appropriate education

simply because that school lacks the stamp of approval of the same public school

system that failed to meet the child's needs in the first place**."** See Carter v.

Florence County Sch. Dist., 950 F2d 15, 164 (4th Cir.1991), aff'd 510 U.S. 7

(1993); Florence County School Dist. Four v. Carter, 510 U.S. 7, 14 (1993).  The

Court recognized that "when a public school system has defaulted on its

obligations under the Act, a private school placement is `proper under the Act' if

the education provided by the private school is `reasonably calculated to enable the

child to receive educational benefits.'" Florence County School Dist. Four v.

_Carter_, 510 U.S. at 11, quoting <u>Board of Ed. of</u> <u>Hendrick Hudson Central School</u> <u>Dist. v. Westchester Cty. v. Rowley</u>, 458 U.S. 176, 207 (1982). Therefore, since the district failed to provide A.S. with FAPE, and Defendants showed that the Lewis School provided A.S. a placement and program reasonably calculated to provide her with an educational benefit, Judge Crowley correctly determined that Defendants prevailed, and Plaintiff's meritless appeal must be denied.

**POINT XI-THE LEWIS SCHOOL IS AN APPROPRIATE LEARNING ENVIRONMENT FOR A.S.**

The Supreme Court has held that the IDEA authorizes courts to order school authorities to reimburse parents for their expenditures on private education for a child if the court ultimately decides that such placement, rather than the proposed IEP, is proper under the IDEA. <u>Sch. Comm. of Burlington v. Dep't of Educ.</u>, 471 U.S. 359, 369, 105 S. Ct. 1996, 85 L.Ed.2d 385 (1985). The Supreme Court noted that this reimbursement is not a form of "damages," but is reimbursement for expenses that the school "should have paid all along and would have borne in the first instance had it developed a proper IEP." <u>Id</u>. at 370, 105 S. Ct. 1996. Thus, Defendants are entitled to full reimbursement.

In the present case, A.S.'s parents presented sufficient evidence through documents and testimony of expert, Jaime Lehrhoff, reports from A.S.'s medical providers, and evidence of her schoolwork and report cards, that the Lewis School is meeting A.S.'s social emotional, physical, and educational needs. She thrived so

much in that learning environment that despite Mr. Scott testifying that he told A.S.'s mother that she would never go to college, A.S. is now a freshman at High Point University and doing well. Thus, the Lewis School was an appropriate learning environment where A.S. made progress and it prepared her for college.

**POINT XII- DEFENDANTS' COUNTERCLAIMS MUST BE GRANTED**

Defendants have proven their counterclaims have merit and must be granted. The district cannot sustain its burden of proof and it failed to provide A.S. with FAPE in the LRE. Defendants can show that the Lewis School was appropriate and that A.S. is now in college due to the education she received there. Defendants were the prevailing party in the due process action and are entitled to recover all expert fees and costs under Section 504, attorney's fees and costs, full reimbursement for tuition and transportation, and A.S. is entitled to compensatory education in the form of a monetary equivalent to said hours.  Thus, summary judgment should be entered in favor of Defendants, including all fees and costs.

**CONCLUSION**

Based on the foregoing reasons and based on a modified de novo review, Defendants respectfully request that this Court deny Plaintiff's appeal and affirm Judge Crowley's Final Decision.

By: */s/ Julie Warshaw, Esq.*

Dated: October 24, 2022                             Julie Warshaw, Esq.