**WARSHAW LAW FIRM, LLC**
**Julie Warshaw, Esq.** (ID# 027931993)
220 Davidson Avenue, Suite 124
Somerset, New Jersey 08873
<u>MAILING ADDRESS:</u>
P.O. Box 276
Liberty Corner, New Jersey 07938
Phone (973) 433-2121
Fax (973) 439-1047
<u>jwarshaw@warshawlawfirm.com</u>
Attorney for Defendants/Counterclaimants

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## NEWARK VICINAGE

| | |
|---|---|
| **EAST BRUNSWICK TOWNSHIP BOARD OF EDUCATION**<br><br>Plaintiff,<br><br>vs.<br><br>**D.S. and M.S. o/b/o/ A.S.;**<br><br>Defendants. | **CIVIL ACTION**<br><br>**Case No.: 2:21-cv-08279 (BRM-JSA)** |

## DEFENDANTS/COUNTERCLAIMANTS'
## STATEMENT OF UNDISPUTED MATERIAL FACTS

Dated: October 24, 2022

1

## INTRODUCTION AND BACKGROUND INFORMATION

Please note that for clarity of citations, the following are the references to the transcripts from the due process hearing: 1T-Hearing Transcript August 10, 2020; 2T- Hearing Transcript August 12, 2020; 3T Hearing Transcript August 14, 2020.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

1.      A.S. was a female classified student in the East Brunswick school District located in East Brunswick, New Jersey. (Certification of M.S., Paragraph 3).

2.      The school district failed to meet A.S.'s needs, so she was unilaterally placed at the Lewis School of Princeton. (Certification of M.S. Paragraph 4).

3.      Despite A.S.' case manager stating that she would not be a fit for a college education a sentiment obviously shared by the district in general, A.S. is currently enrolled as a freshman and participates in the academic support program called the Learning Excellence Program at High Point University. (Certification of M.S., Paragraph 36).

4.      A.S. was determined to be eligible for special education and related services in October 2005 when she was in preschool.  She remained eligible after preschool.  Her classification was Communication Impaired. (Certification of M.S., Paragraph 5).

5.      In 2009, A.S. was classified as Other Health Impaired – Pervasive Developmental Disorder-Not Otherwise Specified and Attention Deficit

Hyperactivity Disorder after a re-evaluation eligibility meeting. (Certification of M.S., Paragraph 6).

6.     Then, two years later, A.S.'s classification was changed back to Communication Impaired.  She was evaluated by the district in 2011, and not again until 2018 and then, it was only due to the A.S.'s physician's recommendation, despite failing to make any significant or meaningful educational process and not meeting any of her IEP goals and objectives. (Certification of M.S., Paragraph 7).

7.     A.S.'s classification was apparently changed because she had been in a self-contained class, up until the 2018-2019 school year, and the only way the district would allow her to be placed in general education classes to develop her socialization skills was to change her classification, despite her disabilities remaining the same. (Certification of M.S., Paragraph 8).

8.     A.S. has also been diagnosed with General Anxiety Disorder, Disruptive Mood Dysregulation Disorder, Attention Deficit Hyperactivity Disorder-Inattentive Type, Expressive Language Disorder, and a Specific Learning Disability in reading comprehension and written expression. (Certification of M.S., Paragraph 9).

9.     A.S. has been in a variety of special education programs including a self-contained class for students with disabilities and a general education setting with support. (Certification of M.S., Paragraph 11).

10.     Defendants/Counterclaimants trusted the case managers and professionals to provide the most appropriate education plan for A.S., which trust was a mistake as they mislead them and A.S. was not provided with a meaningful education and did not receive the services she was entitled to. (Certification of M.S., Paragraph 10).

11.      Defendants/counterclaimants hired private tutors and their own speech therapists, which the district came to rely upon rather than providing A.S. with the services she needed in school. (Certification of M.S., Paragraph 12).

12.     Members of A.S.'s Child Study Team reiterated to M.S. that that they did not believe that A.S. should be pulled out of class for speech, occupational therapy, and other necessary therapies as they indicated the focus needed to be on academics. (Certification of M.S., Paragraph 13).

13.     M.S. was told by an administrator that the district did not have the budget to meet A.S.'s needs. (Certification of M.S., Paragraph 14).

14.     M.S. had requested a one-to-one aide but was advised that A.S. was not entitled to one. (Certification of M.S., Paragraph 15).

15.     School staff regularly assured M.S. that A.S. was doing well and they could fix things. (Certification of M.S., Paragraph 16).

16.     After evaluations were done, after the lapse from 2011-2018, Defendants/Counterclaimants came to realize the real extent of A.S.'s issues and

deficits and thus placed her at the Lewis School. (Certification of M.S., Paragraph 17).

17.    Lisa A. Kotler, M.D., of Hassenfeld Children's Hospital at NYU Langone performed a Diagnostic Psychiatric Evaluation on August 27, 2018, paid for by Defendants/Counterclaimants. (Certification of M.S., Paragraph 18).

18.    Dr. Kotler diagnosed A.S. with Generalized Anxiety Disorder, Disruptive Mood Dysregulation Disorder, ADHD- inattentive subtype, specific learning disorder with impairment in reading and written expression and a History of Expressive Language Disorder. (Certification of M.S., Paragraph 19).

19.    Dr. Kotler indicated A.S. needed cognitive behavioral therapy for anxiety and sadness. (Certification of M.S., Paragraph 20).

20.    Connor Scott, M.Ed., LDT-C, performed an Educational Evaluation on October 11, 2018, and October 26, 2018, for the district. (Certification of M.S., Paragraph 21).

21.    Mr. Scott acknowledged that based on his own evaluation that in-class support in a general education classroom was not an academically appropriate placement for A.S. (Certification of M.S., Paragraph 22).

22.    Mr. Scott reviewed the reading goals of the October 24, 2016 IEP, and confirmed that it said that A.S. should be reading at an 8th grade level. Mr. Scott confirmed that he did not believe that A.S. could achieve the reading goals because

it has her reading at a level much higher than what she was at. (Certification of M.S., Paragraph 23).

23.    Mr. Scott confirmed that it was accurate to say that in 2011 she was reading at a first-grade level, in 2016 she was reading at a mid-third grade level, and in 2018 she went down to reading at a second and third grade level. These scores showed that A.S. regressed. (Certification of M.S., Paragraph 24).

24.    Mr. Scott confirmed that his review of the progress reports for each of those school years showed that A.S. did not meet any of the goals and objectives in her IEPs from 2016-2019. The reports specifically stated that A.S. did not meet any of her math goals and objectives in those years. (Certification of M.S., Paragraph 25).

25.    According to A.S.'s medical providers, she requires a smaller more structured learning environment where reading, reading comprehension, and language disabilities could be addressed.  (Certification of M.S., Paragraph 26).

26.    In fact, Dr. Kotler wrote a letter to the child study team dated June 25, 2019, which indicated, A.S. "has continued to have focus difficulties and academic struggles in her current school setting, despite getting a number of academic accommodations. I am in support of her attending a specialized school for students with learning disorders and ADHD such as the Lewis School. This school can address [A.S.'s] learning, focus and emotional needs in a small class setting."  P-48

which was not filed on Administrative Record. (Certification of M.S., Paragraphs 27 and 40).

27.     A.S.'s therapist, Dr. Rachel Strohl from Stress and Anxiety Services of New Jersey indicated in her letter dated June 24, 2019, that A.S. has attended weekly therapy since September 5, 2018. Dr. Strohl also noted that A.S. would greatly benefit from an out of district placement that specializes in language-based learning disabilities and offers a smaller, more individualized classroom setting, such as The Lewis School.  (Certification of M.S., Paragraph 28).

28.     Due to the fact that the district failed to provide the appropriate educational setting for A.S. and their attorney was not responsive to requests from Defendants/Counterclaimants' attorney, Defendants/Counterclaimants had no choice but to unilaterally place A.S. and seek full reimbursement, transportation, fees and other costs from the district. (Certification of M.S., Paragraph 29).

29.     Defendants/Counterclaimants properly sent their 10-day unilateral placement notice to the district.  (Certification of M.S., Paragraph 30).

30.     On June 26, 2019, Defendants/Counterclaimants filed for due process and a full hearing was conducted. (Certification of M.S., Paragraph 31).

31.      On January 5, 2021, Defendants obtained an Order from Judge Crowley in the Office of Administrative Law in their favor, whereby Judge Crowley ordered reimbursement for the unilateral placement and continued placement at the Lewis

School and compensatory education in the amount of fifty hours. (Certification of M.S., Paragraph 33).

32.    The district still has not fully complied with Judge Crowley's Order or that of Judge Martinotti. (Certification of M.S., Paragraph 34)

**TESTIMONY AND EVIDENCE FROM THE DUE PROCESS HEARING**

**M.S.:**

33.    A.S. participated in early intervention when she was two. ECF Doc. No. 9, Att. 15- 3T117:14-18.

34.    A.S. has "Amblyopia, Strabismus and…Intermittent Exotropia. So her -- So her eye -- She has lazy eye. It's been corrected, but it's still -- is lazy. And her vision is really poor in one of her eyes. So she wears glasses." ECF Doc. No. 9, Att. 15- 3T117:24-118:11.

35.    A.S. injured up her ankle in 2016. She had surgery then in December of 2016 and in August 2017, but it still has not healed since 2016. ECF Doc. No. 9, Att. 15- 3T118:12-22.

36.    Dr. Kruger at CHOP in Philadelphia, Children's Hospital did a developmental pediatric evaluation dated April 11, 2007. ECF Doc. No. 9, Att. 15- 3T118:23-119:7. A.S. was tested for autism, which she turned out not to have. She was possibly PDD-NOS. ECF Doc. No. 9, Att. 15- 3T118:23-119:7; 3T119:21-120:4.

37.     The report was given to the school district. 3T120:5-7. Exhibit P-16.

38.     During that time frame A.S. was in a half-day mainstreamed class, and a half-day LLD class at Warnsdorfer Elementary School in East Brunswick." ECF Doc. No. 9, Att. 15- 3T123:18-25.

39.     A.S. has never been in an LLD classroom since that time and was not offered an LLD classroom since that time. ECF Doc. No. 9, Att. 15- 3T124:1-6.

40.     A.S. was seen by Dr. Seshadre at Robert Woods Johnson for a neurodevelopmental follow up and the recommendations in the doctor's report dated April 10, 2008, were: "That she had a diagnosis of PDD-NOS. She doesn't believe that A.[S.] should be in an autistic program. She's high functioning. It's important to recognize that her symptoms are those of PDD-NOS, rather than a simple developmental language disorder. She needed continued speech, OT, language therapies and she needs a low student-to-teacher ratio, at least part of the day." ECF Doc. No. 9, Att. 15- 3T124:7-17. ECF Doc. No. 9, Att. 6, P-18.

41.     Dr. Seshadre recommended physical therapy. ECF Doc. No. 9, Att. 15-3T124:18-20.

42.     This report was given to the district. ECF Doc. No. 9, Att. 15- 3T124:21-23. ECF Doc. No. 9, Att. 6, P-18

43.     A.S. had occupational therapy for three years from February 2006 until April of 2009. ECF Doc. No. 9, Att. 15- 3T125:18-21.

44.     M.S. had no idea why occupational therapy was removed in 2009. It was just taken out. An occupational therapy evaluation was not done before removing occupational therapy. ECF Doc. No. 9, Att. 15- 3T125:22-126:6. ECF Doc. No. 9, Att. 6, P-19 through P-24.

45.     The first time the district evaluated A.S. was in 2004, for a preschool disabled program. ECF Doc. No. 9, Att. 15- 3T127:4-8.

46.     A.S. was classified as Communication Impaired at the time. ECF Doc. No. 9, Att. 15- 3T127:9-16.

47.     This classification was changed to Other Health Impaired around May 2007. ECF Doc. No. 9, Att. 15- 3T127:17-24.

48.     A.S. testified that she did not remember if her daughter was evaluated by the district in 2007. ECF Doc. No. 9, Att. 15- 3T127:25-128:7.

49.     A.S. was evaluated in 2011. P-2; ECF Doc. No. 9, Att. 15- 3T128:8.

50.     A.S. was in third grade at this time. ECF Doc. No. 9, Att. 15- 3T128:23-25.

51.     M.S. read from this educational evaluation. "Upon aging out of the preschool disabilities category, A. was found re-eligible for services under the federal classification category of Other Health Impaired." ECF Doc. No. 9, Att. 15- 3T129:12-21, 3T129:22-130:3.

52.    A.S. did not have any occupational therapy services or social skills monthly consults after third grade and no explanation was given as to why they were removed. ECF Doc. No. 9, Att. 15- 3T130:6-9, 3T130:10-13.

53.    Exhibit P-3 was identified by M.S., as "the psychological report from the East Brunswick Public School, December 19th, 2011, third grade." 3T131:7-15. M.S. read from the psychological report. "Recent private evaluations, one from March 2011, confirming that A.[S.] has a history of anxiety, as well as a secondary attention deficit disorder. And one from late 2010, indicates that A. has auditory processing deficits, which could be contributing to her academic difficulties." ECF Doc. No. 9, Att. 15- 3T131:18-132:1.

54.    M.S. confirmed that to her knowledge the district did not ever include any goals and objectives, or programming, or accommodations for A.S.'s auditory processing issues in her IEP. ECF Doc. No. 9, Att. 15- 3T132:2-6.

55.    M.S. read from the report. "A.[S.] transitioned to her home school, Central Elementary, in September 2010, after attending a self- contained LLD class for first grade in Warnsdorfer Elementary. She has been receiving special education support since being identified, as a preschooler, as being in need of special education. A.[S.] repeated kindergarten. A.[S.] currently receives pullout replacement services for language arts and in-class resource center for science,

11

social studies, and math. A.[S.] also receives speech as a related service." ECF
Doc. No. 9, Att. 15- 3T132:7-18.

56.    M.S. never rejected an LLD class. After third grade the district never offered
A.S. an LLD class. ECF Doc. No. 9, Att. 15- 3T132:19-23. ECF Doc. No. 9, Att. 6,
P-3.

57.    M.S. identified Exhibit P-4 as "a social assessment from East Brunswick
Public Schools" from third grade. ECF Doc. No. 9, Att. 15- 3T133:8-17; ECF Doc.
No. 9, Att. 6, P-4.

58.    M.S. confirmed that she notified the district that A.S. had outside
evaluations. She read from the social assessment. "A.[S.] was diagnosed with an
auditory processing disorder … Dr. Cargan has diagnosed A.[S.] with anxiety
disorder, attention deficit hyperactivity disorder, and a learning disability." ECF
Doc. No. 9, Att. 15- 3T133:18-134:7.

59.    M.S. had also notified the District of A.S.'s eye condition and it is noted on
page 38 of the social assessment. ECF Doc. No. 9, Att. 15- 3T134:8-16.

60.    M.S. confirmed that A.S.'s placement had changed over time. "She had been
in an all resource room. She had been in all in-class support. She had been back
and forth, a little bit of each, never being able to find the correct placement." ECF
Doc. No. 9, Att. 15- 3T134:17-135:7.

61.     M.S. said that A.S. had issues with A.S. being placed in the resource room.
"In sixth or seventh grade, she was bullied. She was punched by a girl in the
resource room. The kids screamed and yelled, erratic behaviors. And she was
embarrassed by it. It was a very upsetting time. She came home with a lot of
anxiety." ECF Doc. No. 9, Att. 15- 3T137:25-138:9.

62.     A.S. did not have any of the behaviors that she described seeing in the
resource room. Many of the teachers had written and had always told M.S. that
A.S. is a pleasure to have in class. ECF Doc. No. 9, Att. 15- 3T138:10-17.

63.     Being placed in the general education setting caused A.S. a lot of anxiety. "It
was too hard for her. But she didn't even know, because -- the teacher, you know,
the teachers would accommodate her, modify everything. But she didn't even
know what her struggles were." ECF Doc. No. 9, Att. 15- 3T138:18-25.

64.     A.S. had friends in the general education setting but not in the resource
room. ECF Doc. No. 9, Att. 15- 3T139:1-6.

65.     A.S.'s grades in East Brunswick High School were not consistent ECF Doc.
No. 9, Att. 15- 3T140:18-21.

66.     A.S. had no progress in school until she got to the Lewis School.
Additionally,    the    case    managers    knew    from    early    on    that
Defendants/Counterclaimants wanted to send A.S. to college. They relied upon the
professionals in the district however and then became very concerned because

things were not moving in the right direction. ECF Doc. No. 9, Att. 15- 3T140:22-141:8.

67.    M.S. said that she did not know why A.S. was not evaluated from 2011-2018. "I do not know. I just know that when I went to see Dr. Lisa Kotler, from NYU, psychiatrist, in August of 2018, she asked me why my child hadn't been evaluated. And so she told me to go back and ask for an evaluation, and I did." ECF Doc. No. 9, Att. 15- 3T141:9-16.

68.    When asked if she ever told the district not to evaluate her child between 2011 and 2018, she said "Yes. It was sometime in the year 2017. I was told to wait until she was 16 to reevaluate for that specific testing. Because there's test brackets or ages that you do certain testing. So she was going to be tested at 16." ECF Doc. No. 9, Att. 15- 3T141:17-24.

69.    Connor Scott, A.S. case manager, at that time, was one of the people who told her that. ECF Doc. No. 9, Att. 15- 3T141:25-142:1.

70.    A.S. had academic support outside of the classroom. She had private tutors 4 to 7 days a week. Sometimes for an hour, sometimes for 2 hours. ECF Doc. No. 9, Att. 15- 3T142:2-13.

71.    A.S. went to therapy once a week. She was going for speech therapy, for a very long time, privately." ECF Doc. No. 9, Att. 15- 3T142:2-13. M.S. said "I wanted to do whatever I could do to get her to reach her goals. And I knew that I

had to hire tutors. I mean, G-d only knows where she would have been if I didn't. She -- She needed help with her homework. I mean, by the time she go to high school, I mean, she couldn't even -- I mean, she needed a lot of extra help. And, you know, in her younger days when she had speech -- When we could tell that she had a speech problem, we got her a speech therapist." ECF Doc. No. 9, Att. 15-3T142:14-25.

72.    M.S. identified Exhibit P-5 as "an IEP from January 28th, 2015." 3 ECF Doc. No. 9, Att. 15- T143:1-4. M.S. noted that A.S. was removed from occupational therapy services. "I remember the case manager -- managers telling me that the priority was to get her educated in the classroom. And it was important not to miss any academics. So not to be pulled out for speech, OT, anything, because she really needed to be in the classroom." ECF Doc. No. 9, Att. 15-3T143:22-144:5.

73.    The district never presented the parents with a draft IEP that proposed occupation therapy or proposed speech therapy that was rejected by the parents. ECF Doc. No. 9, Att. 15- 3T144:6-13, 3T144:14-17.

74.    The belief by the district professionals was that it was s more important for A.S. to be in the classroom than to receive the necessary related services. ECF Doc. No. 9, Att. 15- 3T144:24-145:2.

75.     When asked why A.S. went from resource room to ICR classes and back again several times M.S.. said "Nothing was ever the right solution. She was getting bullied; she was embarrassed in the resource classes. In the general ed, they were too fast, they were too far ahead; she couldn't keep up. So there was never a happy medium. As a matter of fact, in sixth or seventh grade at Hammarskjold, I spoke to the assistant principal, Ms. Green. I remember exactly where I was when I spoke to her. And I said to her, like, "Why has this child been bouncing back and forth for so many years and why can't we get the right class?" **And she told me that East Brunswick didn't have the budget for the class that we really needed**." (emphasis added). ECF Doc. No. 9, Att. 15- 3T145:3-20.

76.     M.S. said that she did not know why A.S.'s auditory processing disorder that was mentioned in the earlier District documents is no longer mentioned in the later documents. "It all of a sudden got lost in the shuffle." ECF Doc. No. 9, Att. 15- 3T145:21-146:2.

77.      When asked if anyone ever told her to get another auditory processing evaluation completed, she said the Lewis School did shortly after we arrived there and on October 15, 2019, they went for an auditory processing evaluation. 3 ECF Doc. No. 9, Att. 15- T146:3-7. ECF Doc. No. 9, Att. 7, P-35.

78.     M.S. confirmed that Melissa Lohan of Capital Health Hamilton did the evaluation. 3T146:14-22. The report said that A.S. had an auditory processing

disorder. The report included recommendations that said   with auditory processing you need to retrain the brain. The necessary type for this is what the Lewis School is known for. The Lewis School is known for auditory processing and Dyslexia learning disabilities. ECF Doc. No. 9, Att. 15- 3T146:23-147:14.

79.    M.S. read from the report: "The results of this central auditory test battery revealed significant difficulties in the areas of tolerance, fading memory, binaural separation, auditory memory, auditory closure, integration, and auditory decoding. Difficulty was also noted for the area of auditory figure and outdoor ground." ECF Doc. No. 9, Att. 15- 3T147:15-25. Exhibit P-35.

80.    A.S. did not have a one-to-one aide in the district. M.S. had always requested an aide, even a shared aide; but was told A.S. was not entitled to one. ECF Doc. No. 9, Att. 15- 3T148:25-149:6.

81.    A.S. did not receive counseling by the district to address her generalized anxiety disorder. ECF Doc. No. 9, Att. 15- 3T149:9-12.

82.    While A.S. was in the East Brunswick School District, she was never evaluated by a behavioral analyst and never had a functional behavioral assessment done. ECF Doc. No. 9, Att. 15- 3T149:13-17.

83.    When asked what the source of A.S.'s anxiety was M.S.. said "School. School. You know, she -- she went back and forth from resource room to main -- mainstream in- class support, so it was a divide about like whether it was better to

be with these kids who were way beneath her, socially, who were beating her up, who were learning so slowly, or was she better off being in the mainstream class, where her friends were, and where she was very far behind. And it caused her a lot of anxiety. Because she didn't fit in anywhere." ECF Doc. No. 9, Att. 15-3T149:18-150:3, 3T150:4-8, 3T150:9-12.

84.    M.S. read from Exhibit P-6 under the extended school year section. "Significant regression without recoupment is not anticipated over the summer. It is felt that A.[S.] will benefit more from participating in a camp program with her typically-developing peers." 3 ECF Doc. No. 9, Att. 15- T150:13-22.

85.    Defendants/Counterclaimants were never offered an extended school year program for A.S. during her time at East Brunswick School District. ECF Doc. No. 9, Att. 15- 3T150:23-151:1.

86.    Defendants/Counterclaimants raised concerns about A.S. with her Case Managers, Connor Scott and Jackie Emert all the time and came to know them on a first name basis because of the frequency with which they interacted. M.S. trusted them. ECF Doc. No. 9, Att. 15- 3T151:2-10.

87.    The case managers always assured M.S. that things would work out and everything would be okay and that they would fix things. They said things were going fine and that A.S.'s teachers really liked her, and she was not causing any problems. ECF Doc. No. 9, Att. 15- 3T151:11-17.

88.    M.S. identified Exhibits P-25 and P-26 as an educational evaluation dated October 11th, 2018, and a psychological evaluation dated November 13, 2018, both from East Brunswick High School. ECF Doc. No. 9, Att. 15- 3T151:18-152:2; ECF Doc. No. 9, Att. 6, P25 and P26.

89.    M.S. recalled having discussions with A.S.'s Case Manager, Mr. Scott, about the results of the 2018 evaluations. "Yes. I -- This was all new to me. Connor went over it with me. And I was devastated. I couldn't believe -- I couldn't believe it. I was like in shock. I mean, I think that I'm a pretty smart person. And I should be able to tell, somewhat, where my daughter was. But this -- this took me by surprise." ECF Doc. No. 9, Att. 15- 3T152:5-13.

90.    M.S. participated in every IEP meeting except for when they did not call her in. M.S. said, "When they were like modifying things. They would just say, We're doing this. And I -- I left it in their hands. I trusted them. I -- I almost felt like Connor and Jackie were my friends." ECF Doc. No. 9, Att. 15- 3T152:14-23.

91.    M.S. received progress reports for her daughter online. ECF Doc. No. 9, Att. 15- 3T153:15-19.

92.    M.S. was aware that A.S. was not achieving her goals and objectives. "Yes. Because we knew that she wasn't -- she wasn't getting anywhere. She wasn't achieving her goals. And it was always like, she will, she will." ECF Doc. No. 9, Att. 15- 3T154:9-13.

93.     M.S. said the case managers assured her and said, "She will". ECF Doc. No. 9, Att. 15- 3T154:14-16.

94.     M.S. identified Exhibit P-33 as A.S.'s 10th grade through 7th grade report cards from East Brunswick School District. 3T155:3-156:6. M.S.. said on the 7th grade report card A.S. received As, B+s, Bs and a C+. Teacher comments were ""Has made excellent progress." "Is a pleasure to teach." "Has a positive attitude." "Is a responsible and cooperative student." ECF Doc. No. 9, Att. 15- 3T156:7-25. M.S.. said A.S.'s 8th grade report card had A+s, B+s and one C+. Teacher comments were "Has a positive attitude. Is responsible and cooperative. Has shown improvement in self-control. Is a pleasure to teach -- a pleasure to have in class. Keep up the good work." ECF Doc. No. 9, Att. 15- 3T157:1-10; ECF Doc. No. 9, Att. 7, P33.

95.     M.S. reviewed A.S.'s 9th grade report card. "A pluses. A couple of C's. One A minus. "She needs to volunteer more in class discussion and for class activities. Is a pleasure to teach." ECF Doc. No. 9, Att. 15- 3T157:11-15. M.S. reviewed A.S.'s 10th grade report card. "One A, a couple of B's, a couple of C's, and a D plus." One teacher comment said, "Should seek help when needed." ECF Doc. No. 9, Att. 15- 3T157:16-23. ECF Doc. No. 9, Att. 7, P-33.

96.     M.S. identified Exhibit P-34 as "her schedule that we received in August of 2018, telling us who her teachers are. So like -- This is her schedule. The staff was

unknown for History and Study Skills. And them for Chemistry and Algebra II, it says, "New special ed teacher." But they don't have a name." 3 ECF Doc. No. 9, Att. 15- T158:15-23; ECF Doc. No. 9, Att. 7, P-34.

97.    Regarding staffing M.S. said, "There were many subs for the first -- first couple of weeks of school, in tenth grade. I was writing back and forth to Connor, very often, asking him when are her special ed teachers coming in. Algebra II, she had Ms. Yang. And she was -- she was teaching a class of 25 to 30 children, not a special ed teacher. You know, and there was no special ed teacher in Algebra. There was -- There were no special ed teachers. There were subs. The School District hadn't prepared." ECF Doc. No. 9, Att. 15- 3T159:3-14.

98.    At the end of September, the beginning of October M.S. sent an email to Connor Scott, that states that A.S. does not have an Algebra II teacher. -- And Connor responded by saying that Algebra II is very challenging for students -- for many students and it's a big jump from Geometry. Yet, A.S. was making that jump from Geometry to Algebra II without a special ed teacher in the mainstream class." ECF Doc. No. 9, Att. 15- 3T159:18-160:3. P-49, Certification of M.S., Paragraph 40.

99.    M.S. read from an October 2, 2018, email from Mr. Scott to her. "I also wanted to let you know that A.[S.]'s math class now has an in-class support teacher. ECF Doc. No. 9, Att. 15- 3T160:20-161:4.

100.    M.S. confirmed that she had requested for A.S. to be switched to a resource room for math but the district did not switch her to said resource room citing scheduling issues. ECF Doc. No. 9, Att. 15- 3T161:17-19, 3T161:20-24.

101.    M.S. read from an email dated October 9, 2018, from her to Mr. Scott. "Sorry to bother you again. A.[S.] just called me from the bathroom crying. I told her to see you, since she can't stay there." ECF Doc. No. 9, Att. 15- 3T161:25-162:14.

102.    M.S. noted in her email that, "Ms. Chang gave A.[S.] severe anxiety. She was a special ed teacher, who came in late. And I asked Ms. Chang, as I did Mr. Arshon, to give A.[S.] her personal space. She needed her personal space. And they kept on getting in her face. And they both caused her a lot of anxiety." ECF Doc. No. 9, Att. 15- 3T162:15-21, 3T162:22-163:16. Exhibits P-49 and ECF Doc. No. 9, Att.7, P-35, Certification of M.S., Paragraph 40.

103.    Between 2007 and 2018 A.S. was never evaluated for speech. ECF Doc. No. 9, Att. 15- 3T164:24-165:7.

104.    M.S. was asked if there was something in particular that happened to cause her and her husband to unilaterally move A.S. out of East Brunswick School District to the Lewis School. She responded "our 2018 IEP, after the educational evaluation, psych, speech evaluations, I mean, I was so disappointed in them because I knew she was behind, but I couldn't believe, you know, these IQ scores.

And we were devastated. So we went to her IEP meeting. And my husband came to that one. Renee Davis actually came to that one. Nobody from the higher ups had ever really been to our IEP meetings. Because we knew that this was complicated. A.[S.] had been moved in and out of mainstream in-class support general ed and moved back into resource room, and then back and forth, back and forth. It was like -- I mean, this was tenth grade already, and we still don't have a plan in place what this child's going to do. She was regressing. She -- She hadn't learned anything in years. So Mr. Arshon came up with the idea that -- And I've always said -- Sorry to back up for a minute. I've always said that I want my child to go to college. You know, that was part of the plan from very early on. I know plans don't always work out, but we wanted her to go to college. And Mr. Arshon said, let's -- as long as she does her work and comes to class, we will pass her. And I believe Mr. Troshane may have been there, History. And so that's what they decided to do. So my husband and I left there and we were like, "She's -- she hasn't learned a thing. She's never going to learn anything else here. We can't let her graduate high school and not ha -- know how to give somebody change." So that's when we decided to look into the Lewis School. And so she was evaluated there. And I was actually nervous that she may not get in. They tested her, she got in. And we sent her there." ECF Doc. No. 9, Att. 15- 3T165:8-167:1.

105.   Renee Davis was a director of Special Services she had never attended one of A.S.'s IEP meetings before. ECF Doc. No. 9, Att. 15- 3T167:2-14.

106.   Mr. Arshon was A.S.'s special ed teacher in Math and her Study Skills teacher. He was a big man who intimidated A.[S.] and caused her a lot of anxiety which made her hate going to those classes. ECF Doc. No. 9, Att. 15- 3T167:15-20.

107.   M.S. spoke to Mr. Scott and a college counselor about A.S. going to college and the counselor told her that A.S. could go to college. ECF Doc. No. 9, Att. 15- 3T167:21-168:2.

108.   The college counselor based his opinion on all of A.S.' reports. He was a special ed college counselor. ECF Doc. No. 9, Att. 15- 3T168:3-12, 3T168:13-19.

109.   Mr. Scott's opinion on A.S. attending college was that "she has too many learning differences. I forget the words he used. And it probably wouldn't happen. And we should consider vocational school or something -- some other road. ECF Doc. No. 9, Att. 15- 3T168:20-169:1; Exhibit R-15. 3T169:10-16.

110.   An evaluation was done by the Lewis School dated May 29, 2019. ECF Doc. No. 9, Att. 15- 3T170:4-14. This report found that A.S. has several -- strengths, but several weaknesses. The report identified six (6) learning strengths and sixteen (16) learning weaknesses. The Lewis School was willing to help her overcome as

much as possible." ECF Doc. No. 9, Att. 15- 3T170:15-21; ECF Doc. No. 9, Att. 6, P-29.

111.    M.S.. said that she did not know why the district did not do a triennial evaluation for A.S. every three years. She said "Well, when I asked later on, when she got it, they told me that they're very -- they would tell me that they were longer tests, it was going to be taking her out of the classroom, and it wasn't going to change anything on her IEP. So we should just leave it. Actually, Ms. Emert was the first person to tell me that, I believe." ECF Doc. No. 9, Att. 15- 3T171:5-16, 3T171:17-25.

112.    Defendants/Counterclaimants sought help for A.S.'s anxiety. "Yes. We are currently seeing Dr. Lisa Kotler from NYU, Langone in Hack -- in Hackensack. And she's also seeing Dr. Rachel Strohl from the Stress and Anxiety Center here in East -- East Brunswick. She sees Dr. Strohl once a week for therapy." ECF Doc. No. 9, Att. 15- 3T172:10-18.

113.    Prior to that A.S. saw "Dr. Lawrence Vantig who is also here in East Brunswick, for therapy." ECF Doc. No. 9, Att. 15- 3T172:19-21; ECF Doc. No. 9, Att. 6, P-28.

114.    In Dr. Strohl's report, she said, "A.[S.] strongly benefitted from being at the Lewis School this year. Because they offer smaller -- smaller classes, more individualized attention. And the small structure that all of her IEP's said that she

needed. And her anxiety has gone way down. And she's also feeling more confident." ECF Doc. No. 9, Att. 15- 3T173:7-15.

115.   M.S. gave a copy of the report to the district. ECF Doc. No. 9, Att. 15- 3T173:16-18.

116.   M.S. described a report from Dr. Strohl dated July 14, 2020. "That she's benefitting from the out of placement at the Lewis School. And this type of structure, with individualized attention, has actually allowed her to utilize her therapy skills. So she has an overall reduction in her anxiety. And she's confident. And she can learn." ECF Doc. No. 9, Att. 15- 3T173:19-174:8.

117.   M.S. gave a copy of this report to the district. ECF Doc. No. 9, Att. 15- 3T174:9-10. P-28. 3T174:12-18.

118.   M.S. identified Exhibit P-45 as Dr. Lisa Kotler's diagnostic psychiatric evaluation from August 27, 2018." ECF Doc. No. 9, Att. 15- 3T174:22-175:5; ECF Doc. No. 9, Att. 7, P-45.

119.   M.S. said she gave the report to the District and that Mr. Scott was in touch with both Dr. Kotler and Dr. Strohl. ECF Doc. No. 9, Att. 15- 3T175:6-13.

120.   Dr. Kotler's diagnoses of A.S. included: Generalized anxiety disorder, ADHD, disruptive mood dysregulation, a history of expressive language disorder, learning disorder and impairment in reading and written expression." 3 ECF Doc. No. 9, Att. 15- T175:14-25; ECF Doc. No. 9, Att. 7, P-45.

26

121.  Dr. Kotler said that she was in support of A.S. continuing her current placement at the Lewis School because she was doing so well in that setting. ECF Doc. No. 9, Att. 15- 3T176:18-22; ECF Doc. No. 9, Att. 6, P-30.

122.  In Dr. Kotler's report dated June 25, 2019. 3T177:8-11; P-48, she said that "A.[S.] was having focus difficulties and academic struggles in East Brunswick High School. And she was getting quite a number of academic accommodations." Dr. Kotler was in favor of A.S. going to a school that specialized in students with learning disabilities. 3T177:14-21. Exhibit P-48.

123.  A.S. was in a reading and writing class at the Lewis School. A reading and writing class was not offered to A.S. at East Brunswick High School. ECF Doc. No. 9, Att. 15- 3T178:5-15.

124.  When asked if she noticed a difference in her daughter's emotional state after she started attending the Lewis School M.S. said, "Yes. After 3 weeks we noticed a difference. She was more confident. She had less anxiety. She was happy. She felt smart. She came home and said, "Mommy, I can learn." "They taught me how to hold a pencil." She was feeling very good about herself. And that has continued." ECF Doc. No. 9, Att. 15- 3T178:16-24.

125.  When asked if she noticed a difference in A.S.'s academics since attending the Lewis School M.S.. said "She -- I mean, I don't know if you want to call handwriting academics. But her handwriting has – has improved so much, that you

can see. She can write papers now without being cranky about it. She's not nervous to do her homework. She -- She comes right home and does what she needs to do. She feels confident with the work she's doing. I mean, I heard her on Zoom with her teachers and she's happy in class." ECF Doc. No. 9, Att. 15- 3T178:24-179:10.

126.   At that point, Defendants/Counterclaimants no longer needed to have private tutors for A.S. because the Lewis School provided for her needs. 3 ECF Doc. No. 9, Att. 15- T179:11-15.

127.   When A.S. was enrolled in the Lewis School, for the fall semester, first marking period, her grades were A's and B's, and one C. The second and third marking period grades were A's and B's and one C. The fourth marking period grades were A's and B's." ECF Doc. No. 9, Att. 15- 3T184:12-17. P-40.

128.   M.S. perspective on the grades from the Lewis School as compared to those from the district: "In the Lewis School I'm seeing improvement every semester -- every quarter. Her grades were all over the place in East Brunswick. And I believe these grades. These are true grades because I -- I basically knew what her grades were before her report card came. Because the teachers, you know, are in touch with us. And we know what -- we know exactly what's going on. And I believe that these are true grades. I also know that Financial Literacy would have been an extremely hard course in East Brunswick, and -- and she wouldn't have gotten the

support she needed." ECF Doc. No. 9, Att. 15- 3T184:18-185:6; ECF Doc. No. 9, Att. 7, P-40.

129.   On July 15, 2019, Defendants/Counterclaimants gave proper unilateral placement notice to the district via a form.    3T185:20-186:4;  P-36. Defendants/Counterclaimants also sent an email to the district at the same time. ECF Doc. No. 9, Att. 15- 3T186:7-9; ECF Doc. No. 9, Att. 7, P-36.

130.   Defendants/Counterclaimants' attorney also sent a ten-day notification of unilateral placement dated July 17, 2020, that came from Ms. Warshaw. ECF Doc. No. 9, Att. 15- 3T186:18-23; P37, as well as the ten-day notice of unilateral placement dated July 17, 2020, from M.S. and D. S. to the Superintendent of Schools. ECF Doc. No. 9, Att. 15- 3T187:1-8; ECF Doc. No. 9, Att. 7, P-37.

131.   No one in East Brunswick High School ever discussed putting A.S. into an LLD class after third grade. 3 ECF Doc. No. 9, Att. 15- T189:9-11.

132.   A.S. was evaluated by independent evaluators – Dr. Healey and Ms. Lehrhoff. ECF Doc. No. 9, Att. 15- 3T189:12-16.

133.   A.S. was offered an extended school year at the Lewis School. 3 ECF Doc. No. 9, Att. 15- T189:23-25.

134.   A.S. attended the extended school year at the Lewis School the summer of 2020 remotely. She had classes with her teachers every day and the English teacher met with her privately twice a week. ECF Doc. No. 9, Att. 15- 3T190:1-10.

135.   When asked if she ever signed a waiver saying that she was offered and rejected speech services for A.S. in the District M.S. said, "Yes, I guess. I signed a lot of things. I put my faith in my case manager's hands. I may have signed off on it because somebody had told me that -- get the speech privately, don't take her out of class." ECF Doc. No. 9, Att. 15- 3T190:21-191:4.

136.   M.S. clarified and said it was not an actual waiver it was an IEP that she signed. ECF Doc. No. 9, Att. 15- 3T191:5-8.

137.   M.S. said that the district did not have her sign a consent form saying that she agreed to allow speech services to be removed from A.S.'s IEP or one that stated she consented to remove corrective reading from A.S.'s IEP. ECF Doc. No. 9, Att. 15- 3T191:15-18, 3T191:19-22.

138.   M.S. said that the district did not have her sign a consent form stating that she consented to having social skills removed from A.S.'s IEP. ECF Doc. No. 9, Att. 15- 3T191:23-192:2.

139.   M.S. confirmed that A.S. was never offered counseling services through the district. 3 ECF Doc. No. 9, Att. 15- T192:2-4.

140.   M.S. confirmed that the district never gave her a consent form allowing the district not to conduct triennial evaluations. 3 ECF Doc. No. 9, Att. 15- T192:5-14.

**Ms. Emert, Case Manager:**

141.   Ms. Emert described A.S.'s placement for 8th grade as both pull-out resource and general education in-class resource classes. She indicated that A.S.'s disability was in the area of communication impairment, "which is communication handicap and it's a language disorder and it would indicate that she has difficulty in the area of language, which usually impact her reading comprehension, her writing expression, her written expression, her language across the board." ECF Doc. No. 9, Att. 13-1T41:13-19. She stated, "[w]e usually recommend speech and language therapy in addition to the resource classes or the special ed classes that they're receiving." 1T42:2-4. Ms. Emert confirmed that A.S.' IEP did not provide for speech and language therapy services. ECF Doc. No. 9, Att. 13-1T42:5-13.

142.   During the due process hearing, Ms. Emert noted that the most recent evaluations of A.S. were from 2008 and when asked, indicated that evaluations were not done because the parent did not want them. Yet, there was no proof that this was true or that the district informed the parents what evaluations needed to be completed and for what purpose. The district did not produce any written waivers or signed informed consent forms, and this was contradicted by Defendants/Counterclaimants.  ECF Doc. No. 9, Att. 13-1T90:24-91:7.

143.   Ms. Emert confirmed that throughout the time she was A.S.'s case manager she was aware that A.S. did not have a speech and language plan in her IEP. ECF Doc. No. 9, Att. 13-1T90:9-12.

144.   Ms. Emert confirmed that documentary evidence showed that M.S. did not reject the evaluations proposed by the district but wanted to postpone them to the next school year. ECF Doc. No. 9, Att. 13-1T90:24-91:7.

145.   Ms. Emert confirmed that she never went to the Director of Special Services for the District to tell them that A.S. was communication impaired but was not receiving speech and language services. ECF Doc. No. 9, Att. 13-1T92:2-6.

146.   Ms. Emert said that it should not be the child's decision whether to participate in speech and language therapy. ECF Doc. No. 9, Att. 13-1T92:22-24.

147.   Ms. Emert did not recall seeing in any IEP that a read and write program was offered to A.S. ECF Doc. No. 9, Att. 13-1T92:25-93:7.

148.   Ms. Emert stated that the services provided to A.S. were: "The resource setting and the in-class setting where she was receiving resource standards in the in-class setting to help her with accommodating keeping her in that setting when the parent was requesting that she remain there." 1 ECF Doc. No. 9, Att. 13-T93:19-25.

149.   Ms. Emert said that in the resource class A.S. "was not receiving speech and language services, but she was receiving as we said with the graphic organizers, breaking down information, reviewing information that she didn't understand, those types of accommodations, not speech and language services, no." ECF Doc. No. 9, Att. 13-1T94:1-8.

150. Ms. Emert confirmed that related services are not the same thing as modifications and that A.S. was not receiving any related services in the resource room. ECF Doc. No. 9, Att. 13-1T94:17-22.

151. During the anchor classes A.S. was getting emotional support when she was having a bit of a hard time, but it was not counseling. ECF Doc. No. 9, Att. 13-1T94:23-95:2.

152. A.S. was not receiving any occupational therapy in the resource room. ECF Doc. No. 9, Att. 13-1T95:3-6.

153. Ms. Emert was not aware that A.S. received occupational therapy services in the district prior to 2009. ECF Doc. No. 9, Att. 13-1T95:7-12.

154. Ms. Emert confirmed that no evaluations were conducted on A.S. by the school district from 2007-2011 and then from 2011-2018. ECF Doc. No. 9, Att. 13-1T101:3-6.

155. Ms. Emert noted that the IEP listed that a social evaluation was performed on A.S. on April 12, 2001, a date before A.S. was born in 2001. Ms. Emert said she did not write the document, she just read it. She did not know if the IEP was ever corrected. ECF Doc. No. 9, Att. 13-1T101:7-18.

156. Ms. Emert confirmed that she did not perform any speech and language, social, educational, or psychological evaluations on A.S. 1 ECF Doc. No. 9, Att. 13-T101:19-102:2.

157.   Ms. Emert confirmed that according to the IEP the last speech and language evaluation performed on A.S. was in 2007. ECF Doc. No. 9, Att. 13-1T102:16-19.

158.   Ms. Emert confirmed that when she was a case manager several IEPs were amended without an IEP meeting. 1 ECF Doc. No. 9, Att. 13-T102:20-23.

159.   While Ms. Emert was a case manager no speech and language therapist ever attended any of A.S.' IEP meetings. ECF Doc. No. 9, Att. 13-1T102:24-103:2.

160.   Ms. Emert confirmed that in the PLAAF section of the IEP teachers had said that A.S. was struggling "in her in-class settings, yes. In the general ed setting with in-class support." ECF Doc. No. 9, Att. 13-1T103:3-8.

161.   Ms. Emert confirmed that even though A.S. was struggling, while she was case manager A.S.'s placement changed from pull out replacement classes to gen ed classes at the request of the parents. ECF Doc. No. 9, Att. 13-1T103:9-13.

162.   Ms. Emert confirmed that a functional behavioral assessment was never done for A.S. while she was A.S.'s case manager. ECF Doc. No. 9, Att. 13-1T110:19-111:20.

163.   Ms. Emert said that while she was A.S.'s case manager A.S. did not receive individualized reading instruction. ECF Doc. No. 9, Att. 13-1T111:21-112:3.

164.   Ms. Emert said that A.S. was not offered one-to-one reading instruction outside of the classroom as a related service. ECF Doc. No. 9, Att. 13-1T112:7-10.

165.  Ms. Emert confirmed that the child study team did not conduct any evaluations and did not rely on any current child study team evaluations in developing the IEP dated August 18, 2017, in deciding to keep A.S. in the in-class resource for history. ECF Doc. No. 9, Att. 13-1T129:25-130:19, T133:22-134:1.

166.  Ms. Emert reviewed the IEP dated October 24, 2016, which had a behavior plan dealing with A.S.'s anxiety and she confirmed that she was aware of the behavior plan and that she wrote it. ECF Doc. No. 9, Att. 13-1T134:2-16.

167.   Ms. Emert stated that she did not recall if she consulted with a behaviorist or psychologist when she wrote the behavior plan, and that the IEP did not state that she consulted with a behaviorist or psychologist. ECF Doc. No. 9, Att. 13-1T134:17-23.

168.  Ms. Emert confirmed that a functional behavior assessment was not performed and that no one was assigned to collect data about A.S. under the behavior plan. ECF Doc. No. 9, Att. 13-1T134:24-135:6.

169.  Ms. Emert confirmed that the teacher in the anchor class was assigned to report on whether A.S. was in compliance with the behavior plan. The teacher was reported to by A.S.'s other teachers and then would report to Ms. Emert. The teacher was not a behavior specialist and not a certified BCBA behaviorist. ECF Doc. No. 9, Att. 13-1T135:11-25.

170.   Ms. Emert confirmed that in the goals and objectives section of the IEP there were no specific measurable goals or objectives for A.S. to achieve under the behavior plan. ECF Doc. No. 9, Att. 13-1T136:18-25.

171.   Ms. Emert confirmed that while she was case manager, she never had A.S.'s parents sign a waiver that they agreed that the speech and language specialist would not attend child study team meetings. ECF Doc. No. 9, Att. 13-1T143:15-20.

172.   Ms. Emert was not aware that A.S.'s parents were paying for private speech lessons outside of school, but she was aware that A.S. received counseling outside of school. ECF Doc. No. 9, Att. 13-1T143:22-25.

173.   When asked about whether a vocational assessment was conducted when A.S. turned 14, Ms. Emert said, "We offer to students who are in need if we feel that there is a need for it. We also offer them Naviance at the age of 14, which is the program where they receive assessments. School counselors offer it to them. I think they're required to do it actually." ECF Doc. No. 9, Att. 13-1T146:20-147:3.

174.   Ms. Emert confirmed that A.S. never had a vocational assessment during the time she was her case manager. ECF Doc. No. 9, Att. 13-1T147:25-148:7.

**Connor Scott, Case Manager:**

175.   Connor Scott, A.S.'s more recent case manager when she was in 10th grade, said that to his knowledge the triennial evaluations were not performed in 2017 because the parents did not consent. ECF Doc. No. 9, Att. 14-2T93:5-13.

176.   Mr. Scott said that he was not aware that A.S.'s parents were told that the IEP would not change so there was no need for testing. ECF Doc. No. 9, Att. 14-2T93:15-18.

177.   Mr. Scott said the only written consent that he was aware of that showed that the parents did not consent was what he read in Exhibit R-14. ECF Doc. No. 9, Att. 14-2T94:24-95:10.

178.   Mr. Scott thereafter confirmed that within the first week or two of school M. S. called to request that the evaluations be conducted. ECF Doc. No. 9, Att. 14-2T94:11-25.

179.   Mr. Scott was aware that A.S. had not been evaluated for speech since 2007. He was also aware that several of A.S.'s IEPs were amended without meetings. ECF Doc. No. 9, Att. 14-2T95:1-8.

180.   Mr. Scott recalled that half of A.S.'s classes were in pull-out replacement classrooms and half were in in-class resource general education classrooms prior to coming to him as the case manager in 10th grade. 2 ECF Doc. No. 9, Att. 14-T95:17-24.

181.   Mr. Scott confirmed that when he became case manager all of A.S.'s classes were changed to in-class general education support classes, despite the fact that he knew that they were not appropriate classes for A.S. ECF Doc. No. 9, Att. 14-2T95:25-96:3.

182.   Mr. Scott was aware that A.S. was diagnosed with generalized anxiety disorder. ECF Doc. No. 9, Att. 14-2T96:4-8.

183.   Mr. Scott confirmed that A.S. was not offered one-to-one supplemental reading instruction while he was case manager. ECF Doc. No. 9, Att. 14-2T96:18-22.

184.   Mr. Scott confirmed that he believed A.S. needed reading intervention but did not recommend a one-to-one supplemental reading program for her. 2 ECF Doc. No. 9, Att. 14-T96:23-97:5.

185.   Mr. Scott confirmed that he has noted that A.S. had difficulty with eye contact when he first met her. ECF Doc. No. 9, Att. 14-2T97:6-10.

186.   Mr. Scott was not aware that A.S. had significant eye issues that may have prevented her from making eye contact. ECF Doc. No. 9, Att. 14-2T97:11-14.

187.   Mr. Scott confirmed that he had read A.S.'s previous IEPs and evaluations but the only thing he knew about her eyes was that she wore glasses. He was not aware of other complications. ECF Doc. No. 9, Att. 14-2T97:15-25.

188. Mr. Scott was not aware that A.S. had had eye surgery ECF Doc. No. 9, Att. 14-. 2T98:1-4.

189. Mr. Scott confirmed that A.S. perceived that she was doing well in school. ECF Doc. No. 9, Att. 14- 2T98:5-8.

190. Mr. Scott did not feel that A.S.'s misperception was a manifestation of her disabilities. He said, "…in my experience students who have difficulties are able to express their difficulties or are able to discuss what's hard in class. Especially students are very aware of their grades and are able to look at their grades and understand that, you know, if they're failing a class that means they're probably having difficulty with it." ECF Doc. No. 9, Att. 14-2T98:9-24.

191. Mr. Scott told the Court "I agreed that she didn't recognize that she was struggling and that she lacked insight into her educational needs. I didn't agree that it was a manifestation of her disability." ECF Doc. No. 9, Att. 14-2T99:4-10.

192. Mr. Scott agreed that a school district is supposed to provide an education that meets a child's academic, social-emotional, and physical needs. ECF Doc. No. 9, Att. 14-2T99:13-17.

193. Mr. Scott agreed that he worked collaboratively with A.S.'s parents the whole time he was a case manager and that he reached out to A.S.'s psychologist and psychiatrist. He did not agree that the district relied upon the fact that A.S.'s parents provided outside tutoring to meet her academic needs. He said, "[w]e

didn't rely on that. That was something that helped support the placement that the parents were advocating for. We made the case for a more restrictive placement that the outside provider was also in agreement with."  ECF Doc. No. 9, Att. 14-2T99:22-100:13.

194.   Mr. Scott confirmed that prior to the IEP meeting that A.S.'s parents were in agreement with A.S. being placed in the more restrictive environment. He went on to say that at the IEP meeting the parents insisted on the in-class resource option. ECF Doc. No. 9, Att. 14-2T100:14-22.

195.   Mr. Scott confirmed that he was aware based on his own evaluation that in-class support in a general education classroom was not an academically appropriate placement for A.S. ECF Doc. No. 9, Att. 14-2T100:23-101:2

196.   Mr. Scott said that the Director of Special Education was at the IEP meeting, so he never expressed it to her, but she was aware of it because she was at the meeting. ECF Doc. No. 9, Att. 14-2T101:3-9.

197.   Mr. Scott confirmed that the Director of Special Services attended the IEP meeting in December 2018 as an observer, but the district did not afterwards file for due process. ECF Doc. No. 9, Att. 14-2T101:14-25.

198.   Mr. Scott confirmed that he never personally went to speak with the school psychologist about A.S.'s attendance in classes and her inability to realize her limitations. ECF Doc. No. 9, Att. 14-2T102:8-103:2.

199.   Mr. Scott confirmed that he was aware that A.S. received counseling outside of school but did not offer her counseling in school. ECF Doc. No. 9, Att. 14-2T103:3-10.

200.   Mr. Scott said "it was not my recommendation to include any more services in her IEP that would pull her out of class. The speech therapy was the greatest aid at that time and there was resistance to that. So in my opinion it would have been more beneficial to continue to collaborate and consult with the outside provider because at that point A.[S.] had not accepted her disability and had not accepted that she needed support and that was a conversation that I had with Dr. Strohl that that would be a goal of therapy outside of school. She would help to support us inside of school." ECF Doc. No. 9, Att. 14-2T103:10-22.

201.   Mr. Scott confirmed that a school district is required to provide appropriate service for a student. ECF Doc. No. 9, Att. 14-2T103:25-104:4.

202.   Mr. Scott confirmed that a one-to-one aide was not provided for A.S. ECF Doc. No. 9, Att. 14-2T105:13-16.

203.   Mr. Scott confirmed that his assessment showed that A.S. would benefit from functional math but that she was placed in Algebra II. ECF Doc. No. 9, Att. 14-2T105:17-24.

204.   Mr. Scott confirmed to the Court that some students in the resource room had behaviors just like some students in the ICR (in-class resource) room had behavior issues. ECF Doc. No. 9, Att. 14-2T106:16-25.

205.   Mr. Scott was not aware that there was a student who had physically harmed A.S. in the resource room. He was not aware that a harassment, intimidation and bullying complaint was filed against that student for what was done to A.S. ECF Doc. No. 9, Att. 14-2T107:9-17.

206.   Mr. Scott did not acknowledge that A.S. had significant anxiety as a result of what happened in the resource room and that she did not have peers to speak with in the resource room. ECF Doc. No. 9, Att. 14-2T107:18-24.

207.   Mr. Scott read from a document that "A.[S.] is reportedly triggered by the behaviors of other students in the resource center classes which has led to avoidant behaviors in the past." ECF Doc. No. 9, Att. 14-2T108:1-12.

208.   Mr. Scott was aware of this trigger based on a parental report. ECF Doc. No. 9, Att. 14-2T108:13-17.

209.   Mr. Scott confirmed that he was aware that A.S.'s current program was not addressing her deficits. ECF Doc. No. 9, Att. 14-2T111:7-10.

210.   Mr. Scott confirmed that when A.S.'s schedule was made there were no special education teachers assigned to two of her classes. ECF Doc. No. 9, Att. 14-2T111:18-112:1.

211.   About the staffing issues Mr. Scott said, "So as I had just mentioned from my recollection there was a staffing need that was not filled. So other special education teachers were assigned to teach those classes as an overage or an additional teaching period and then once a staff member was secured and hired on a full-time basis they replaced that teacher who was assigned to do the extra compensation period." ECF Doc. No. 9, Att. 14-2T112:6-17.

212.   Mr. Scott confirmed that A.S.'s reading level had regressed between 2011-2018 and yet, never offered A.S. individual reading instruction. He identified Exhibit P-2 as the educational evaluation performed by the school district dated December 16, 2011. ECF Doc. No. 9, Att. 14-2T115:2-5. The reports states, "that A.S. is currently reading at an independent level F or first grade reading level" and that she regressed over the summer months. ECF Doc. No. 9, Att. 14-2T115:6-20.

213.   Mr. Scott read from A.S.'s January 11, 2016, IEP (exhibit P-6 or R-10) teacher summary that said, "A. is a seventh grade -- in a seventh grade resource room for language arts. She is currently reading on an independent level O." ECF Doc. No. 9, Att. 14-2T117:18-118:5.

214.   Mr. Scott confirmed that he was familiar with the Fountas & Pinnell reading levels and that Level O corresponded with a mid-third grade reading level. ECF Doc. No. 9, Att. 14-2T118:9-14.

215.   Mr. Scott confirmed that from the 2011 evaluation through the 2016 IEP, A.S. went from a first-grade reading level to a mid- third grade reading level. ECF Doc. No. 9, Att. 14-2T118:15-21.

216.   Mr. Scott reviewed the reading goals of the October 24, 2016 IEP, and confirmed that it said that A.S. should be reading at an 8th grade level. ECF Doc. No. 9, Att. 14-2T118:23-119:11; ECF Doc. No. 9, Att. 2, P-7.

217.   Mr. Scott confirmed that he did not believe that A.S. could achieve the reading goals because it has her reading at a level much higher than what she was at. ECF Doc. No. 9, Att. 14-2T119:21-25.

218.   Mr. Scott did not see a mention of A.S.'s reading level in the October 2016 IEP. Mr. Scott confirmed that when he tested A.S. in October 2018 she was reading at a second to third grade level. ECF Doc. No. 9, Att. 14-2T122:2-6.

219.   Mr. Scott confirmed that it was accurate to say that in 2011 A.S. was reading at a first-grade level, in 2016 she was reading at a mid-third grade level, and in 2018 she went down to reading at a second and third grade level. ECF Doc. No. 9, Att. 14-2T122:7-13.

220.   Mr. Scott was aware there were no other evaluations between 2011 and 2018. ECF Doc. No. 9, Att. 14-2T122:21-24.

221.   Mr. Scott was aware that A.S. had a behavior plan and that at some point it was removed from her IEP without any functional behavioral assessment. 2 ECF Doc. No. 9, Att. 14-T122:25-123:4.

222.   Mr. Scott confirmed that when he was case manager the only two placement options discussed were in-class general education setting or pull-out replacement resource room. ECF Doc. No. 9, Att. 14-2T123:5-12.

223.   Mr. Scott was not aware that from 2016-2019 A.S. did not meet a single goal or objective in her IEP. ECF Doc. No. 9, Att. 14-2T123:18-21.

224.   Mr. Scott confirmed that he had read A.S.'s progress reports. ECF Doc. No. 9, Att. 14-2T123:22-23.

225.   Mr. Scott reviewed school progress reports from 2016 through 2019 and he confirmed that his review of the progress reports for each of those school years shows that A.S. did not meet any of the goals and objectives in her IEPs from 2016-2019. The reports specifically stated that A.S. did not meet any of her math goals and objectives in those years. ECF Doc. No. 9, Att. 14-2T124:1-128:3. ECF Doc. No. 9, Att. 11, page 98.

226.   Mr. Scott did not recall if he or the previous case manager removed that behavior plan in the IEP. He said, "That behavior plan was linked to a behavioral program that A.[S.] was no longer in and she no longer demonstrated the need for a

behavior plan at the high school. So I don't recall whether it was me or the previous case manager." ECF Doc. No. 9, Att. 14-2T128:8-13.

227.   In the June 12, 2018 IEP Mr. Scott read that the purpose of the behavior plan was to reduce anxiety in school and to deal with school avoidance and task avoidance. ECF Doc. No. 9, Att. 14-2T129:6-16; ECF Doc. No. 9, Att. 5, P-14.

228.   Mr. Scott confirmed that the behavior plan said that A.S. "tends to remove herself from a class to avoid a stressful situation. She finds the school environment to be overwhelming, specifically the volume of students, the perception that she's not capable of succeeding in the classroom setting, A.[S.]'s tendency to try to…avoid school is a result of her anxiety about these matters." ECF Doc. No. 9, Att. 14-2T129:17-130:1.

229.   Mr. Scott confirmed that the behavior plan went on to say: "A.S. has difficulty entertaining remaining in a class because she feels she's overwhelmed by class responsibilities. Therefore, she will either not enter the class or leave the class and go to the nurse, SAC counselor or case manager. Replacement behaviors should include the opportunity to express her feelings with an adult with whom she has an established relationship. A.S. will attend school daily on a consistent basis. A personal development course period one will assist A.S. with remaining up to date in her courses so she does not become overwhelmed." ECF Doc. No. 9, Att. 14-2T130:2-19.

230.   When asked why the behavior plan was removed when A.S. was still having anxiety and avoidance issues, Mr. Scott said: "So the behavior plan was not targeted at the same behavior that I saw. So from my knowledge A.[S.] was not attending school and there was school avoidance due to anxiety. That behavior was not taking place. She was not going to the nurse. She was not going to a SAC counselor. She was not going to the case manager. It was a resistance to overcoming more difficult tasks. Mr. Scott admitted that the behavior plan did not address her actual behaviors. ECF Doc. No. 9, Att. 14-2T130-23 to 136-5.

231.   Mr. Scott said that the speech therapy was not in the IEP when the behavior plan was removed and confirmed that when speech was added into the IEP and when avoidance of speech became a problem a behavior plan was not put back into the IEP. ECF Doc. No. 9, Att. 14-2T132:6-13.

232.   Mr. Scott confirmed that A.S., during the entire time she was at school, was never evaluated by a behaviorist. 2 ECF Doc. No. 9, Att. 14-T132:14-17.

233.   Mr. Scott confirmed that as A.S.'s case manager he chose to remove her behavior plan despite the fact that she was not evaluated by a behaviorist and a functional behavioral assessment was never done. ECF Doc. No. 9, Att. 14-2T132:18-22.

234. Mr. Scott read from the section of the December 6, 2018 IEP, that summarized his own educational evaluation, "A.[S.]'s very low to low scores in

the areas of broad reading, reading comprehension extended, broad written language, broad mathematics, academic skills, academic fluency, academic application and broad achievement suggest that she will have great difficulty accessing the general education curriculum even with modifications and accommodations put into place. Consideration should be given to revising A.[S.]'s special education program to allow her participation in classes that will address her significant deficits in the broad curricular areas." ECF Doc. No. 9, Att. 14-2T132:23-133:23; ECF Doc. No. 9, Att. 5, P-15.

235.   Mr. Scott confirmed that despite his findings A.S. went from having 50% of her classes being pull-out replacement classes and 50% of her classes being general education to 100% of her classes being general education. ECF Doc. No. 9, Att. 14-2T133:24-134:6.

236.   Mr. Scott confirmed that while he was her Case Manager there were numerous emails with M.S. about A.S. crying in class. ECF Doc. No. 9, Att. 14-2T134:7-11.

237.   Mr. Scott reviewed the emails regarding A.S. crying from October 2018. He confirmed that in the emails M.S. told him that A.S. becomes anxious in that class and starts crying and that she benefits from positive reinforcement. ECF Doc. No. 9, Att. 14-2T134:25-136:11. P-49, Certification of M.S., Paragraph 40.

238.   When asked if he was aware that A.S. became anxious in her classes Mr. Scott said, "So I think that characterizing it as anxious about her classes -- I think that she was anxious about the teacher asking -- putting expectations on her and asking her to productively in study skills. To my knowledge I think this might have been limited to that time or -- so I think that there was some anxiety related to the change in teacher and the change in expectations. ECF Doc. No. 9, Att. 14-2T136:16-137:1.

239.   Mr. Scott confirmed that the behavior plan said that A.S. "tends to remove herself from class to avoid stressful situations. She finds the school environment to be overwhelming, specifically -- -- the volume of students, the perception that she's not capable and it results in anxiety." ECF Doc. No. 9, Att. 14-2T137:2-11.

240.   Mr. Scott's opinion was that A.S.'s anxiety in this situation was not related to the volume of students or the perception that she was not capable. ECF Doc. No. 9, Att. 14-2T137:12-25.

241.   Mr. Scott reviewed the educational evaluation from 2011 section regarding the standard assessment Terra Nova. For reading A.S.'s national percentile score in 2011 was 19 and Mr. Scott found A.S. to be in the 0.3 percentile. 2 ECF Doc. No. 9, Att. 14-T138:18-139:9; ECF Doc. No. 9, Att. 1, P-2.

242.   For language A.S. was in the 4th percentile in 2011 and Mr. Scott found A.S. to be in the 6th percentile in his evaluation in 2018, assuming both numbers refer to written language. ECF Doc. No. 9, Att. 14-2T139:10-20.

243.   In 2011 A.S.'s national percentile score in math was 27 and in 2018 Mr. Scott found A.S. to be in the 0.3 percentile. ECF Doc. No. 9, Att. 14-2T139:21-140:4.

244.   Mr. Scott confirmed that when he sat in on the 2018 IEP meeting there were other teachers that attended. Mr. Arshan, the math teacher was present. ECF Doc. No. 9, Att. 14-2T140:5-9.

245.   Mr. Scott said that "So based on the new accommodations and modifications that we added Mr. Arshan had suggested that the work would be significantly modified and that as long as A.[S.] was cooperative and was willing to, you know, work on the work that was assigned to her -- her instructional level the parents didn't have any reason to worry because he didn't want to create more stress." ECF Doc. No. 9, Att. 14-2T140:18-141:4.

246.   "[T]he accommodation that was put into place was that the work would be modified to the level of a resource room class and assuming that A.[S.] completed that work with resource room proficiency then she would earn a passing grade." ECF Doc. No. 9, Att. 14-2T141:11-15.

247.  Mr. Scott confirmed that the Director of Special Education attended that meeting. 2T141:16-19.

248.  Mr. Scott confirmed that exhibit R-2 (P-14), at the bottom under the "employment career" heading, it says "A.S. will explore possible career options through her elective classes. The possibility of the career orientation program at the Woodbridge campus of Middlesex County Vocational School was discussed" ECF Doc. No. 9, Att. 14-2T141:20-142:5; ECF Doc. No. 9, Att. 5, P-14.

249.  Mr. Scott said that to his knowledge A.S. was not put into the program. Mr. Scott confirmed that the district did not perform a vocational assessment as part of the IEP. ECF Doc. No. 9, Att. 14-2T142:25-143:3.

250.  Mr. Scott confirmed that children ages 14 and up should be assessed for a vocational evaluation. ECF Doc. No. 9, Att. 14-2T143:4-6.

251.   Mr. Scott confirmed that A.S. was almost 16 at the time of this December 2018 IEP. ECF Doc. No. 9, Att. 14-2T143:7-9.

252.   Mr. Scott reviewed emails between him and M.S. in April 2019. Mr. Scott confirmed that he wrote "Because A.S. is classified under the category of communication impaired she needs to receive some type of speech-language therapy." ECF Doc. No. 9, Att. 14-2T143:10-19; ECF Doc. No. 9, Att. 10, page 56.

253.  Mr. Scott confirmed that to his knowledge A.S. was classified as communication impaired since 2007. ECF Doc. No. 9, Att. 14-2T143:20-22.

254.   Mr. Scott confirmed that he made a proposal in the email "that she be moved to a consultative model where Mrs. Trembley consults with the teachers to provide strategies for supporting A.S." but this proposal was not accepted and A.S. remained in speech therapy. ECF Doc. No. 9, Att. 14-2T143:23-144:6.

255.   Mr. Scott confirmed that a consultative model is not the same as receiving actual speech and language services from a speech therapist. ECF Doc. No. 9, Att. 14-2T144:7-11.

256.   Mr. Scott confirmed that he was aware that there were no goals and objectives related to articulation in the IEP. "That would be correct because they were not in to work on in therapy by the speech therapist." ECF Doc. No. 9, Att. 14-2T145:22-146:2.

257.   Mr. Scott said that he was aware that there were no speech and language goals and objectives in the progress reports. "I believe I was aware, but there was no speech and language services in the IEP. There couldn't have been any goals associated with them." ECF Doc. No. 9, Att. 14-2T146:3-9.

258.   Mr. Scott confirmed that he wrote a note saying "A.S. does not feel she's getting support." ECF Doc. No. 9, Att. 14-2T147:5-9.

259.   Mr. Scott reviewed a September 27, 2018, email in which A.S.'s parents asked to have A.S. placement in math changed to a resource room. ECF Doc. No. 9, Att. 14-2T147:16-148:7.

260.    Mr. Scott confirmed that he said that Algebra II was a challenging class for anyone especially if you are coming from a geometry resource room. He went on to express concerns that a change in math would affect A.S.'s schedule and should be discussed at the October meeting, which did not take place. ECF Doc. No. 9, Att. 14-2T148:8-19, 2T150:6-18.

261.   Mr. Scott confirmed that A.S.'s placement was not changed in the December 6, 2018 IEP. He confirmed that she remained in the general education class even though M. S. had expressed concern and a desire to move her to the resource room in September. ECF Doc. No. 9, Att. 14-2T150:24-151:7.

262.    When asked why, Mr. Scott said, "Because at that time of the October or the December 2018 meeting, we proposed that she would go into a resource math class that focused on functional math skills and that was rejected at that time. I do believe there was a conversation and there were many conversations about math. It was not within the context of an IEP meeting." ECF Doc. No. 9, Att. 14-2T151:8-22.

263.   Mr. Scott confirmed to the Court that the suggestion was made in September but then refused in December and, it was Defendants/Counterclaimants who requested that the math program be changed. ECF Doc. No. 9, Att. 14-2T151:23-152:6.

264.   Mr. Scott said that because A.S. was 16 years old she was part of the IEP team, and her opinion was given consideration. In his opinion even if he had proposed a plan that he believed was appropriate it would not have been signed. ECF Doc. No. 9, Att. 14-2T152:12-16.

265.   However, Mr. Scott confirmed that he never had an experience where A.S. and her family did not sign the IEP. ECF Doc. No. 9, Att. 14-2T152:17-20.

266.   Mr. Scott confirmed that through a parental report he was aware that behaviors of others in the resource room triggered behaviors in A.S. He also confirmed that it was stated in the IEP. ECF Doc. No. 9, Att. 14-2T153:19-154:4.

267.   Mr. Scott reviewed email correspondence with M.S. He confirmed that an October 2, 2018, email discussed that A.S.'s math teacher shared that A.S. was upset in class. Also, the email noted that the math class now had an in-class support teacher. ECF Doc. No. 9, Att. 14-2T154:9-16. P-49, Certification of M.S., Paragraph 40. This meant that prior to October, the math class did not have an in-class support teacher.

268.   In an October 9, 2018 email Mr. Scott confirmed that regarding a possible change to A.S.'s schedule he stated: "I'm concerned that making this -- that move because if A.S. does continue to struggle with algebra two and we consider a move to resource it might mean moving her whole schedule again which might be disruptive to A.S.'s learning given her difficulties with transition." ECF Doc. No.

9, Att. 14-2T154:22-155:8. Instead, he allowed A.S. to remain in algebra and to struggle in a class he knew she was not capable of comprehending or succeeding.

269.   Mr. Scott reviewed a report card for A.S.'s 2018-2019 school year, her 10th grade year when he was A.S.'s case manager. 2T156:6-17. Mr. Scott confirmed that she passed all of her classes. She received an "A" in one class and "B's" in five classes. ECF Doc. No. 9, Att. 14-2T156:18-157:5. Exhibit P-3.

270.   Mr. Scott also confirmed that with the exception of study skills these were all general education classes. ECF Doc. No. 9, Att. 14-2T157:7-10.

271.   Mr. Scott reviewed A.S.'s 9th grade report card and confirmed that she passed all of her classes. ECF Doc. No. 9, Att. 14-2T157:12-21.

272.   Mr. Scott confirmed that she received two As, four Bs and three Cs. ECF Doc. No. 9, Att. 14-2T157:22-24.

273.    Mr. Scott reviewed A.S.'s schedule that was issued on August 30, 2018. He confirmed that for her U.S. History and her Study Skills classes under teacher assignment it said, "staff unknown." ECF Doc. No. 9, Att. 14-2T158:1-12.

274.   Mr. Scott confirmed that as per the parents' request, he relied on a child who may not have the ability to understand her own disabilities when determining her classroom placement. He confirmed that he represented the district when making this decision. ECF Doc. No. 9, Att. 14-2T163:12-164:1.

275.   Mr. Scott confirmed that Naviance was used to explore careers and colleges. ECF Doc. No. 9, Att. 14-2T164:10-12 but that he had indicated that college was unrealistic for A.S. ECF Doc. No. 9, Att. 14- 2T164:13-16.

276.   Mr. Scott confirmed that the district never contracted out with anyone to perform a functional vocational assessment of A.S. ECF Doc. No. 9, Att. 14-2T164:17-20.

277.   When asked if he thought you couldn't provide an appropriate education to someone without evaluations Mr. Scott said: "I think that it's definitely an essential component of the IEP and an essential component of planning. It makes it difficult in my -- when there's not updated evaluations. So yes." ECF Doc. No. 9, Att. 14-2T167:19-168:5.

278.   Mr. Scott agreed with the Court when the Court said wouldn't you say let's not let 8 years go by without evaluating a student who had evaluations done where there were red flags in reading and math. ECF Doc. No. 9, Att. 14-2T168:24-169:9.

279.   When the Court questioned why Mr. Scott would offer up an IEP in 2018 after performing evaluations that he knew A.S. and her parents would accept but that he knew he wouldn't recommend for A.S. in terms of meeting her goals and objectives Mr. Scott said: "Not necessarily in terms of goals and objectives, but it was a good faith effort that we had with -- with -- on the part of the parents where

we would continue to work with the outside provider. The parents would continue to provide tutoring. We would be allowed to do speech therapy and I believe that there was a conversation that we could reassess the program at some point." ECF Doc. No. 9, Att. 14-2T169:11-170:25.

280.   Mr. Scott confirmed that he was trying to come up with something in the IEP that he felt would meet A.S.'s needs as well as be something that she would actually do. ECF Doc. No. 9, Att. 14-2T171:3-10.

**Ms. Lehrhoff, Expert Witness:**

281.   Ms. Lehrhoff testified as an expert witness for Defendants/Counterclaimants at the due process hearing.

282.   Ms. Lehrhoff is the owner of the Livingston Educational Center, LLC. ECF Doc. No. 9, Att. 15- 3T8:21-24.

283.   The Court accepted Ms. Lehrhoff as an expert in education and education of students with disabilities and was qualified to testify as an expert. ECF Doc. No. 9, Att. 15-3T25-16 to 17.

284.   Ms. Lehrhoff conducted an independent evaluation of A.S., she reviewed documents, student records, she observed three different classes in East Brunswick, and she observed a class in the Lewis School. ECF Doc. No. 9, Att. 15- 3T26:4-11.

285.   The English teacher noted that A.S. definitely needs outlines. She needs that scaffolding and support, because writing and pulling out main ideas and

information like that is still, you know, a challenge for A.S. 3 ECF Doc. No. 9, Att. 15- T42:9-43:8.

286.    Ms. Lehrhoff noted that the Lewis School classroom was hitting on all the things that were in deficit." ECF Doc. No. 9, Att. 15- 3T43:13-21.

287.  Ms. Lehrhoff was aware that A.S. was classified as "communication impaired" in the district. ECF Doc. No. 9, Att. 15- 3T56:14-18.

288.  Ms. Lehrhoff said that because A.S. was classified as communication impaired she would have expected her to have been given more of the subtests. "I don't even see any language clusters that were given on this particular test. And while she had a speech and language evaluation, technically, in order to get all the cluster scores needed for a full evaluation after not having one for so long, you would expect to see the oral expression, listening comprehension cluster, at least those two yielded from the language. And I don't see any language on this particular one from the District." ECF Doc. No. 9, Att. 15- 3T56:19-57:8.

289.  Ms. Lehrhoff said that the comparison of scores "shows progress. It shows that progress is being made. She is capable of learning, obviously. And that with the right foundations and the basic skills, that she has the ability to progress in an upward trend." ECF Doc. No. 9, Att. 15- 3T59:6-13.

290.  Ms. Lehrhoff was asked what she attributed this learning to. She indicated that at the Lewis School A.S. was "Getting the basic remediation that she has

needed for many years. Absolutely. I think -- My assumption is that this child really needed to go back to the basics. And now she has been given the year to do so. Even in the District's testing, it was stated that she needed the basic math. And now she's finally getting basics. And it shows that, you know, the scores have improved. And with the foundations, anything is possible." ECF Doc. No. 9, Att. 15- 3T59:14-24.

291.   Ms. Lehrhoff said that A.S. was getting the foundation, the basics, at the Lewis School. ECF Doc. No. 9, Att. 15- 3T59:25-60:4. Ms. Lehrhoff's testing occurred after A.S. had been attending the Lewis School.

292.   Ms. Lehrhoff also noted that, "[a]cademic skills, the standard score was 65 at the 1st percentile. And then going back to my report, academic skills was standard score 82 at the 11th percentile. So that was an increase." ECF Doc. No. 9, Att. 15- 3T60:18-23.

293.   "Academic fluency for the District was standard score 66 at the 1st percentile. And then on mine…Academic fluency was -- Yeah, fluency. Standard score 76 with a percentile of 6. So also an increase." ECF Doc. No. 9, Att. 15- 3T61:3-10.

294.   "Academic applications was standard score 62 at the 0.5 percentile, in the very low range. And then for me, the applications was standard score 74 at the 4th percentile. Also an increase." ECF Doc. No. 9, Att. 15- 3T61:16-19.

295. "[S]o then the broad achievement score was standard score 62 at the 1st percentile, which was in the very low range. And then I have the broad achievement at the standard score of 76 at the 6th percentile. So also an -- an improvement." ECF Doc. No. 9, Att. 15- 3T61:20-62:3.

296. Ms. Lehrhoff was asked for her expert opinion as to why A.S.'s scores improved from 2018 to 2020. "She's learning. She's making progress. She's getting the remediation that she needs. The Lewis School has given her the opportunity to go backwards before she can go forwards. And I truly feel that when a child like this, with this type of profile, is taken back to the basics and given the foundations that anything is possible. And these scores show that she is on an upward spiral. Absolutely." ECF Doc. No. 9, Att. 15- 3T62:6-18.

297. Ms. Lehrhoff described tests that she conducted that the District did not. "So I did -- I obviously did an oral language. I was able to yield scores on the language portion of the Woodcock Johnson." ECF Doc. No. 9, Att. 15- 3T64:9-22.

298. "So I yielded scores for oral language, where I have a cluster score of 70 at the 2nd percentile. Within that was, like a picture vocabulary, … which was also 70 at the 2nd percentile. On measure of oral comprehension, … She scored at standard score 75 at the 5th percentile. Listening comprehension, itself, scored very low range at the standard score 68 at the 2nd percentile, composed of the oral comprehension, which was auditory. And then following directions, … that is

definitely an area of weakness for her as well, where it is standard score 70 at the 2nd percentile. Her oral expression, if you keep scrolling down, also in the low range…standard score 70, 2nd percentile." ECF Doc. No. 9, Att. 15- 3T65:9-66:8.

299.   "I also gave her the Comprehensive Test of Phonological Processing. And the reason why I chose to give this is because a lot of students with weaker decoding and encoding skills, … it really shows whether or not they have the foundations. And so what this showed was that she was in that below average range for phonological awareness. She had trouble with certain portions of this." ECF Doc. No. 9, Att. 15- 3T66:11-67:19.

300.   "I also gave her the Gray Oral Reading Test, just to get another addition, you know, for oral reading… So her scores on that, her rate of reading, was in the poor range. So, you know, the rate at which she reads, 5th percentile. Her accuracy was below average. So how she was reading the words, at the 9th percentile. Her overall fluency for the words read was …at the 5th percentile. And then her comprehension of all the material was also in the 5th percentile. Which gave her an oral reading index of 73, considered at the poor range, at the 4th percentile." ECF Doc. No. 9, Att. 15- 3T67:22-68:16, 3T68:20-69:21.

301.   When asked if A.S. was now performing on grade level and age expectancy, Ms. Lehrhoff said, "No. No, not at all. So, she is definitely not performing on age or grade expectancy. She's still very far behind peers, compared to her age,

because of course this is all compared to others at her age level. So we can't say that or make that assumption. However, we do know -- and again, we're basing it on what we've seen in the past and what we're seeing now -- that she has made gains. And that is really the piece that we're looking at." ECF Doc. No. 9, Att. 15- 3T70:1-12.

302.   Ms. Lehrhoff described what she meant in the report when she said that A.S.'s grades in 9th and 10th grades did not describe her true struggles. "So from the grades that I have, it looked like she was gaining mostly B's and C's, and -- during that year. And so, I just found it very interesting to see -- and I think there was even one A at one point. But I thought it was very interesting that she was struggling so -- so -- you know, so much, that she was obtaining these grades. They were saying that she was walking out of class, and that she was crying, and that she was frustrating -- frustrated. And that she didn't feel that she was prepared. And so … a student who was having these types of troubles were obtaining grades like that, on her own, without a tremendous amount of help. So I just -- I thought that was very interesting." ECF Doc. No. 9, Att. 15- 3T70:13-71:13.

303.   Ms. Lehrhoff was asked what was significant about speech for A.S. "So, it's not even the speech per se, it's the language remediation. That once a week, for a child with a communication impairment, is -- who hasn't even been getting speech and language, is really not enough. I mean, this kid has such deficits in her

language. She's diagnosed communication impaired, and yet she's not receiving any speech and language up to this point, for years. So 23 minutes, I'm not really sure what anybody can do in a 23 minute session, once a week, that is going to do that kind of remediation. And as we know in schools, by the time they walk to where they're going, they're walking back to class, is it really even 23 minutes. So I just feel that that would need -- that would have needed to be, you know, at least 3 days a week, if not more, for -- for a minimum of 30 minutes." ECF Doc. No. 9, Att. 15- 3T71:14-72:9.

304.   Ms. Lehrhoff said that she reviewed A.S.'s 2018-2019 IEP but that it did not mention her central auditory processing disorder. She said that this was significant because "Well, considering that we know that there's such language impairments in her communication impairment, I would assume that any additional diagnosis would be very important, especially one of an auditory processing, because it explains a lot. And there are certain accommodations and modifications that you would put into an IEP if a child is diagnosed with an auditory processing disorder. Such as like an FM System." ECF Doc. No. 9, Att. 15- 3T72:10-73:3.

305. Ms. Lehrhoff confirmed that A.S.'s 2018-2019 IEP did not include occupational therapy. She described why she thought OT was important. "So from work samples … her handwriting was atrocious, illegible. She wasn't even holding

the pencil correctly. … it would have been interesting to see, had she been getting it, what she could have done." ECF Doc. No. 9, Att. 15- 3T73:4-19.

306.   Ms. Lehrhoff was asked about her professional expert opinion regarding the goals and objectives listed in the district's IEP. She stated, "Minimal, actually. I feel like there was maybe one, two at most, for each content area. And they weren't really based on her deficits. They were generalized. So it wasn't even -- I felt reading them, it wasn't even like it was for A.S. It could have been for any child in that grade. So it didn't really address her actual reading deficits, her writing deficits. And that's really what needed to be addressed." ECF Doc. No. 9, Att. 15- 3T73:20-74:7.

307.   Ms. Lehrhoff was asked to describe what she meant in the report when she said "A.S.'s overall IEP was not reflective of a student with severe academic and language deficits. In the same way, she did not quite fit into either resource room or in-class support program, based on her varying weaknesses." ECF Doc. No. 9, Att. 15- 3T74:8-15.

308.   Ms. Lehrhoff said, "So basically, looking at what we know about her now, and looking at the programs that I saw, I just couldn't even picture her in either one of those classrooms. I felt that, like I said prior, the resource room, I didn't even see a lesson. I didn't see any remediation going on. And this is a child who really needs remediation. I wasn't real -- really sure how she was going to be able to even

handle the content that was being taught in either one of those classrooms, because she hadn't had the skills. She didn't have the reading skills to read a story like MacBeth. She didn't have the ability to pull out the information. In the same way of the regular classroom, I wasn't sure how, with, you know, her inability to get her thoughts on paper in the ways that everybody kept saying, and what I saw, that she was going to be able to write a 5-paragraph essay without an immense, immense amount of support. So from either one of those, I'm not sure where she would have really fit in." ECF Doc. No. 9, Att. 15- 3T74:16-75:9.

309. Ms. Lehrhoff also set forth numerous recommendations in her report. ECF Doc. No. 9, Att. 15- 3T75:10-80:12. "There does not appear to be any techniques or measurable goals indicating how to improve upon her basic reading skills, or even her comprehension levels. A lack of goals relative to her functioning indicates that there will be little to no improvement within the content areas. It is extremely difficult to prove A.S. is advancing if her goals are not directly related to her functioning." ECF Doc. No. 9, Att. 15- 3T80:13-24, 3T82:3-11.

310. Ms. Lehrhoff was asked if A.S. made progress while at the Lewis School and she said "We have evidence to show that once she was tested again, now that she had a few months behind her in a school that was giving her the basic remediation, that she has -- has made improvements. The scores show that there has been an increase in multiple areas. And that because she's gone back to the

basics, she is now able to apply those skills in other areas." ECF Doc. No. 9, Att. 15- 3T82:12-23.

311.   Ms. Lehrhoff confirmed that she was aware that A.S. suffered from generalized anxiety. ECF Doc. No. 9, Att. 15- 3T82:24-83:1.

312.   Ms. Lehrhoff was asked to speak about her observation of A.S.'s anxiety and what she found when speaking to the other professionals. "I didn't see any levels of anxiety, per se. In the classroom, she was like right there with everybody else, was participating. I saw a very different child than the one that both teachers had said at the beginning of the year. She was right there with everybody else. She answered questions. She didn't seem nervous when the teacher called on her. I didn't even really see much when I was testing her in -- in terms of anxiety. She -- She did everything she needed to do. This was not somebody that I would have said, not knowing her, had anxiety." ECF Doc. No. 9, Att. 15- 3T83:2-22.

313.   Ms. Lehrhoff responded "Absolutely, yes" when asked if in her expert opinion A.S. was capable of learning in an academic environment. ECF Doc. No. 9, Att. 15- 3T83:23-84:1.

314.   When asked if the district provided an appropriate environment for A.S. in which she made progress Ms. Lehrhoff responded, "No, I don't believe that this was an environment that she made progress in, nor do I think that it was the setting for her." ECF Doc. No. 9, Att. 15- 3T84:12-17.

315.  When asked if in her expert opinion the Lewis school was meeting A.S.'s needs Ms. Lehrhoff replied, "Yes, I do. I think that they are meeting her needs because she needed the remediation, she needed to go back to the basics. And she needed a starting point, and this has taken her to that place." 3 ECF Doc. No. 9, Att. 15- T84:24-85:5.

316.  Ms. Lehrhoff said that when she observed the Lewis School class that she did not see any students who showed behavior issues. 3 ECF Doc. No. 9, Att. 15- T85:6-9.

317.  Ms. Lehrhoff also confirmed that she was hired by the school district to perform an independent educational evaluation ECF Doc. No. 9, Att. 15- 3T85:10-15.

### DUE PROCESS RULINGS ABOUT WITNESS TESTIMONY THAT PLAINTIFF TAKES ISSUE WITH

**<u>Jennifer Garcia:</u>**

318.  During the hearing, the district wished to introduce the testimony of Jennifer Garcia. Ms. Garcia is a speech and language specialist. She works in the East Brunswick School District. Ms. Garcia confirmed that any knowledge she has about A.S. is not from firsthand experience and that while A.S. was in the East Brunswick school district Ms. Garcia never had anything to do with her in any way. ECF Doc. No. 9, Att. 13-1T164:14-21. Ms. Garcia confirmed that she had discussions with counsel and child team study members about A.S. and that she

has reviewed A.S.'s student records. 1 ECF Doc. No. 9, Att. 13-T165:1-7. Ms. Garcia confirmed that she did not have a signed consent form from Defendants/Counterclaimants giving her the right to review A.S.'s records. ECF Doc. No. 9, Att. 13-1T165:8-11. Judge Crowley did not allow her testimony.

**Rosalia Minervini:**

319. Rosalia Minervini was a witness who over objection by Defendants/Counterclaimants was allowed to testify for the district albeit not as an expert. Ms. Minervini confirmed that A.S. was never offered an LLD program at the high school. ECF Doc. No. 9, Att. 14-2T233:11-16.

320. Ms. Minervini confirmed that Ms. Lehrhoff's report stated that "A.S.'s overall IEP was not reflective of a student with severe academic and language deficits. In the same way she did not quite fit into either resource room or in-class support program based on her varying weaknesses." ECF Doc. No. 9, Att. 14-2T234:22-235:8.

321. Ms. Minervini did not know if A.S. was offered a one-to-one reading support program. ECF Doc. No. 9, Att. 14- 2T235:16-20.

322. Ms. Minervini confirmed that she has no firsthand knowledge of A.S. and that she has never met her and that all of her knowledge about A.S. comes from reports or other people. ECF Doc. No. 9, Att. 14-2T235:23-236:9.

323.  Ms. Minervini has never been a child study team member for A.S. and if A.S. was currently in the district she would not be a child study team member for A.S. Ms. Minervini confirmed that she has never written an IEP for A.S. and that she has had nothing to do with A.S. but that she has had access to her files. ECF Doc. No. 9, Att. 14-2T236:10-237:4.

324.  When asked if she had a signed waiver from A.S. parents allowing her to review A.S.'s records Ms. Minervini said that she did not need a waiver and that as Supervisor of Special Education it was required of her to be knowledgeable about every classified student's IEP in district. ECF Doc. No. 9, Att. 14-2T237:5-12.

325.  Ms. Minervini confirmed that she was not the Supervisor of Special Education when A.S. was in District and that currently she is not in District.2T237:13-18.

326.  Regarding Minervini's testimony, the Court said, "Honestly I don't know what an IEP meeting would do for parties who have been in litigation for over a year and the child has been already unilaterally placed for over a year, but I understand the district still has an obligation to do an IEP and I think the parties should move forward with that IEP meeting and this hearing is going to continue. So I'm going to allow this witness to testify because I'm the one who required this to move forward over their objection. … It is a little unusual that there is not a report and a new IEP that would essentially serve as something for Ms. Warshaw

to know what this witness is going to testify because she has no idea what she's going to testify to from a blurb she got from you five days before the hearing date, but I will allow her to reserve her right to recall this witness based on the testimony and I note your objection, but I'm going to allow her to testify." ECF Doc. No. 9, Att. 14-2T192:4-193:1. The Court went on to say: "So I'm -- I'm not going to exclude this witness, but I'm going to reserve on what weight if any I give it based on going forward and I'm happy to have you guys brief that issue, but it -- it is a little unusual that there was no even child study team meeting. There wasn't a proposed IEP and she's going to testify about a proposed IEP that was not even proposed yet. So that's a little awkward." ECF Doc. No. 9, Att. 14-2T199:9-16.

### RELEVANT POST DUE PROCESS OCCURRENCES AND COURT FILINGS

327.  After the due process hearing, on January 5, 2021, ALJ Sarah G. Crowley issued a Final Decision that the East Brunswick Township Board of Education failed to provide FAPE and Ordered the District to reimburse the Defendants/Counterclaimants and pay for costs of the Lewis School.  ALJ Crowley also ordered the district to provide A.S. with 50 hours of compensatory education. [ECF Doc. No. 3].

328.  Judge Crowley stated "I therefore CONCLUDE as set forth above that due to (1) the failure of the District to provide FAPE, (2) the appropriateness of The Lewis School for A.S., and (3) the parents' notice to the District of their

placement, that reimbursement must be granted. N.J.A.C. 6A:14-2.10. Applying the notice requirements of N.J.A.C. 6A:14-2.10(c), reimbursement is appropriate from September 2019, and as long as that placement remains appropriate. The District shall develop an IEP consistent with A.S.' placement at The Lewis School." [ECF Doc. No. 3, page 14].

329.   Judge Crowley said in her Opinion, at page 8, "Having had an opportunity to carefully observe the demeanor of the witnesses, it is my view, and I FIND that M.S. was sincere and credible. I also FIND that the testimony from Jaime Lehrhoff was credible and was consistent with the facts and documentary evidence presented at the hearing. On the contrary, I FIND that the testimony of Connor Scott and Jacqueline Emert was not credible, and their testimony was inconsistent with the documentary evidence and their own testimony about the program that was provided to A.S." [ECF Doc. No.3].

330.   Plaintiff did not comply with any part of ALJ Crowley's Order, did not properly move for a stay of the Order, and instead, on April 5, 2021, filed an appeal in this Court. [ECF Doc. 1].

331.   Although the district refused to abide by Judge Crowley's Order it did not make a motion for a stay in this Court until Defendants/Counterclaimants filed an Order to Show Cause for enforcement and to hold the district in contempt. [ECF Doc. No. 5 and 10].

332.  Defendants filed a motion for an Order to Show Cause and enforcement action as well as an Answer and Counterclaim to Plaintiff's appeal on May 9, 2021 [ECF No.5].

333.  Plaintiff filed opposition to Defendants' motion for an Order to Show Cause and enforcement action on June 7, 2021 [ECF No. 10].

334.  Defendants filed a Reply to Plaintiff's opposition on June 23, 2021 [ECF No.12].

335.  The Honorable Brian R. Martinotti issued an Order dated July 9, 2021, following oral argument on July 7, 2021, ordering immediate compliance with ALJ Crowley's Order. [ECF No. 17].

336.  Thereafter Plaintiff refused to comply with either Court Order by Judge Crowley and Judge Martinotti and Defendants/Counterclaimants filed a second Order to Show Cause. [ECF Doc. No. 19].

337.  In an Order, [ECF Doc. No. 35], entered on December 10, 2021, Judge Martinotti Ordered:

A. East Brunswick School District shall immediately comply with this Court's prior Order dated July 9, 2021, and it shall pay the sum of $36,626.00 to the Lewis School of Princeton by 12:00 pm on December 10, 2021 and if said sum is not paid to the Lewis School by said date and time, the Superintendent and the Board of Education President shall appear before this

Court on Monday, December 13, 2021 to explain why they should not be

held in contempt of Court;

B. East Brunswick School District shall reimburse D.S. and M.S. the total

amount in tuition and transportation for attending the Lewis School, within

fourteen (14) days, and D.S. and M.S. shall provide proof of payment;

C. All pending motions are terminated without prejudice including the district's

motion for stay of enforcement of the final administrative Order;

D. The Court continues to reserve on D.S. and M.S.'s request for attorney's

fees and costs for efforts to enforce Judge Crowley's January 5, 2021 Order

and this Court's July 9, 2021 Order and such request shall be addressed by

this Court at the end of the case.

338.   At this point, the compensatory education component of the Orders has not

been complied with in any fashion. (Certification of M.S., Paragraph 34, 35).

339.   A.S. had a positive experience at the Lewis School and despite the district

not supporting the idea of her going to college, A.S. is currently enrolled as a

freshman at High Point University. (Certification of M.S., Paragraph 36).

340.   As a result of A.S. attending college, the district reaped a financial benefit

because under the law the district was obligated to assume responsibility for A.S.'s

education at the Lewis School, until the end of the school year in which A.S.

turned 21 years of age and before that occurrence, she enrolled in the college program.

**WARSHAW LAW FIRM, LLC**

By: _/s/ Julie Warshaw, Esq._
     Julie Warshaw, Esq.

Dated: October 24, 2022